## IN THE UNITED STATES DISTRICT COURT
## FOR
## THE DISTRICT OF COLUMBIA

JOHN B. MANN – 9330 Harts Mill Road, Warrenton, VA 20186 (540) 974-3725,
MANN TECHNOLOGIES, LLC,
THE REGISTRY SOLUTIONS COMPANY, and
ROBERT B. PATTERSON
                                Plaintiffs

v.                                                    Civil Action No. _____

| | |
|---|---|
| • **DAVID CASTIEL** | 2831 44th St. N.W. Washington D.C. 20007 |
| • **CAMERAN CASTIEL** | 2831 44th St. N.W. Washington D.C. 20007 |
| • **ELLIPSO PRIVATE HOLDINGS, LLC** | 2831 44th St. N.W. Washington D.C. 20007 |
| • **VIRTUAL GEO HOLDINGS, INC.** | 2831 44th St. N.W. Washington D.C. 20007 |
| • **ESBH, INC.** | 2831 44th St. N.W. Washington D.C. 20007 |
| • **MOBILE COMMUNICATIONS HOLDINGS, INC.,**<br>• **VIRTUAL GEO SATELLITE, LLC,**<br>• **AIR STELLAR, INC.,**<br>• **INEVA.COM, INC.** | **Corporation Trust Company**<br>**Corporation Trust Center**<br>**1209 Orange Street**<br>**Wilmington DE 19801** |
| • **ELLIPSAT CORPORATION** | 2831 44th St. N.W. Washington D.C. 20007 |
| • **ELLIPSAT INTERNATIONAL** | 2831 44th St. N.W. Washington D.C. 20007 |
| • **GERALD HELMAN** | 2900 Maplewood Place, Alexandria, VA 22302 |
| • **JAMES BAILEY** | 4303 Oak Hill Drive Annandale, VA 22003 |
| • **JAMES HACKNEY** | 8913 Holly Leaf Lane, Bethesda, MD 20817 |
| • **JUAN TOMASSONI,** | 1298 Stamford Way, Reston, VA 20194 |
| • **LINDA AWKARD**<br>• **LINDA AWKARD & ASSOCIATES, CHTD** | **4201 Cathedral Ave., NW, Suite 4216 West, Washington, DC 20016,** |
| • **RICHARD BURT** | 900 17th Street, NW, Suite 800, Washington, DC 20006 |
| • **MICHAEL TAYLOR,** | c/o HarbourVest Partners, LLC<br>One Financial Center, 44th Floor, Boston, MA 02111 |
| • **MARK GUBERMAN** | 10007 Fernwood Road, Bethesda, MD 20817 |
| • **MATTHEW GOODMAN**<br>• **NATALIE LUDAWAY**<br>• **LEFTWICH & LUDAWAY, PLLP** | **11400 K Street NW, Ste 1000, Washington, DC 20005** |
| • **VANESSA CARPENTER LOURIE**<br>  **VANESSA C LOURIE, PLLP** | 4400 MacArthur Boulevard, Washington, DC 20007 |
| • **T. D. AMERITRADE, INC.,** | 4211 South 102nd Street, Omaha. NE 68127 |
| • **BO BELINSKY,** | 4211 South 102nd Street, Omaha. NE 68127 |
| • **BUTZEL, LONG, TIGHE, PATTON, PLLP**<br>• **THOMAS PATTON**<br>• **KERMIT ROSENBERG** | **1747 Pennsylvania Avenue, Suite 300 Washington, D.C. 20006-4604** |

| • NEAL GOLDFARB | |
|---|---|
| • JOHN DOE(S) | |

**Defendants**
**ELLIPSO, INC., DEBTOR**
              **Unnamed Defendant**

## COMPLAINT FOR MONEY DAMAGES
### AND
### INJUNCTIVE RELIEF

The Plaintiffs, for their Complaint against the Defendants, allege as follows:

## JURISDICTION AND VENUE

*1.*    This action is brought pursuant to the provisions of laws of the United States, including 18 U.S.C. § 1961 et seq., and 11 U.S.C. § 1001 et seq.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1964.

*2.*    This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the claims asserted herein that arise under the laws of the District of Columbia and the Commonwealth of Virginia.

*3.*    The Defendants are subject to the exercise of personal jurisdiction by this Court, and venue lies with this Court pursuant to 28 U.S.C. § 1391(b) and 18 U.S.C. § 1965.

## PRELIMINARY STATEMENT

*4.*    By this action, Plaintiffs seek monetary compensation and injunctive relief for damages inflicted by Defendants through what is, in essence, a "bust out" scheme; conceived, instituted and implemented over the past several years by the prime movers, David Castiel and Cameran Castiel, ("D.Castiel", "C.Castiel", the "Castiels", or the "Castiel Family").  The schemes were designed and implemented by the Castiels to induce various unsuspecting individuals and business entities to invest in, or provide goods and/or services to, or loan money to, various business entities controlled by the

2

Castiels; who systematically looted all assets from these "family" companies, and then used false bankruptcy filings to avoid paying these unsuspecting victims, the creditors, for their goods/services/loans/investments.  While the full extent of the schemes is not known to Plaintiffs at this time, it is estimated that the amounts involved may exceed thirty million dollars ($30,000,000.00).

5.   In furtherance of these bust out schemes, the Castiels employed the other Defendants, including the named company Defendants, to effectuate the fleecing of the victims.  Each of the Defendants knowingly and willingly assisted the Castiels in various aspects of these schemes, as more fully set forth herein.  The Castiels and each of the other Defendants received financial benefits from participation in these schemes.

6.   In furtherance of these schemes, the Castiels and the other Defendants committed numerous (thousands) of acts of wire fraud, mail fraud, bank fraud, Hobbs Act violations, as well as repeated acts of perjury, suborning of perjury, intimidation, extortion, bankruptcy fraud including the filing of false schedules and claims, obstruction of justice, and violations of various other federal criminal statutes.  Each of these acts at various times utilized the interstate banking, telephone, mail, internet, and highway systems, as detailed herein.

7.   In addition to the violations of federal statutes, the Defendants, individually and/or collectively, violated numerous laws of the District of Columbia and the Commonwealth of Virginia, all as set forth herein.

8.   The Plaintiffs, as well as numerous others, were repeatedly victimized by the Castiels' plots, in which the other Defendants joined at various times and in various ways, as more fully set forth herein.  While the full extent of the plots is not known to the

Plaintiffs at this time, it is estimated that the number of victims exceeds thirty-five (35) individuals and/or business entities.  Details concerning the other victims that are known to the Plaintiffs at this time are set forth herein.

9.    As more fully set forth herein, the Plaintiffs were induced by fraud to provide, loans and services to the Castiels' companies.  When the Plaintiffs sought repayment of the loans, and payment for the services delivered to the Castiels' companies, the Castiels launched a pogrom of harassment, intimidation, liable, slander, defamation, false lawsuits, and threats for the purpose of extorting Plaintiffs to abandon their legal rights.  After three years of discovery and a seven day jury trial, Chief Judge Royce C. Lamberth, found that the law suits initiated by the Castiels against the Plaintiffs in this case had been prosecuted "in bad faith."  [A copy of that Decision, which contains a good history of one aspect of the Castiels' misdeeds, is attached as Exhibit 1, and incorporated as if fully set forth herein by reference.].

10.   The Castiels' "bust out" schemes are ongoing.  Ellipso, Inc., (Debtor), is currently in bankruptcy, *In re: Ellipso, Inc. (Debtor), Case No. 09-0148, United States Bankruptcy Court for the District of Columbia,* and thus is an un-named Defendant here. In that bankruptcy proceeding D.Castiel has filed, through counsel, five schedules of Creditors listing debts ranging from approximately six million dollars ($6,000,000.00) to more than forty million dollars ($40,000,000.00).  The Debtor's assets are valued by the Castiels at less than fifty thousand dollars ($50,000.00); while the Castiels have, so far, admitted to taking in excess of two million dollars ($2,000,000.00) out of the company, prior to dumping it into receivership.  The Castiels have proposed a plan to pay the Creditors in that bankruptcy three tenths of a penny ($0.003) on each dollar of debt.

*11.* In that bankruptcy proceeding, *No. 09-0148,* the Castiels, through counsel and individually, have filed false proofs of claim, and caused false proofs of claim to be filed (some by other Defendants herein), exceeding five million dollars ($5,000,000.00).  In that bankruptcy proceeding, D.Castiel individually, and through counsel has made and/or caused to be made, material misstatements of material facts, all as set forth herein.

*12.* Plaintiffs seek injunctive relief to require the Defendants to cease and desist from engaging the pattern and practice of racketeering which has been employed, and continues to be employed against the Plaintiffs, as well as money damages, the trebling of damages, attorneys' fees, costs, pre and post judgment interest, punitive damages and such other relief as may be just and proper.

## INTEGRATED PLEADING

*13.* This is an integrated pleading.  Every allegation is asserted against every Defendant and in every Count; as if fully set forth therein.

## AGENCY

*14.* Defendants, individually and collectively, were and are engaged in a conspiracy to defraud and each of them is liable for the actions of the other as if they themselves had committed the acts. All Defendants were acting as the agents of the others with either express or implied authority to so act in furtherance of their common goal to operate a RICO enterprise and all Defendants benefited financially therefrom and ratified the acts of the others. Therefore, all Defendants are jointly and severally liable for the actions of every other Defendant committed in furtherance of the conspiracy.

## PARTIES PLAINTIFF

*15.* John Mann ("Mann") is an investor and businessman who resides in Warrenton, Virginia. He is one of the owners of Plaintiff, Mann Technologies, LLC, and Plaintiff, The Registry Solutions Company.

*16.* Mann Technologies, LLC, ("MannTech") is a Nevada Limited Liability Company, whose principal office is in Warrenton, Virginia.

*17.* The Registry Solutions Company, ("TRSC") is a Limited Liability Company, organized pursuant to the laws of Nevis, with its principal office in Warrenton, Virginia.

*18.* Robert Patterson ("Patterson") is an attorney and businessman who resides in Warrenton, Virginia. He is one of the owners of Plaintiff, MannTech, and Plaintiff, TRSC.

## PARTIES DEFENDANT

## DEFENDANTS - THE CASTIELS AND THEIR COMPANIES:

*19.* <u>David Castiel</u> ("D.Castiel") is a businessman who resides in Washington, D.C. He is one of the principal owners of Defendants, Ellipso, Inc., Ellipso Private Holdings, LLC., Virtual Geo Holdings, Inc. Mobile Communications Holdings, Inc., Virtual GeoSatellite, LLC., AirStellar, Inc., ESBH, Inc., Ellipsat Corporation and Ellipsat International. At all times relevant D.Castiel was the majority shareholder, Chief Executive Officer, and Treasurer of each of these business entities having sole and exclusive signatory authority on all financial accounts of each.

*20.* <u>Cameran Castiel</u> ("C.Castiel") is a businesswoman who resides in Washington, D.C. She is the spouse of D.Castiel and at all times relevant assisted D.Castiel in the

business enterprises set forth above, and in the undertakings set forth herein including actively joining in numerous illicit acts, as set forth herein.

21.   Mobile Communications Holdings, Inc., ("MCHI") is a Delaware Corporation with its principal office in Washington, D.C.   MCHI was organized in 1991 and became a wholly owned subsidiary of unnamed Defendant Ellipso, Inc., ("Ellipso") upon Ellipso's formation in 1998.  Currently MCHI's stock is held 20% by Ellipso and 80% by Defendant AirStellar.  The relationship of these entities is more fully set forth herein.

22.   Virtual GeoSatellite, LLC, ("VirtualGeo") is a Delaware Limited Liability Company formed in 1999, with its principal offices in the District of Columbia. VirtualGeo is a wholly owned subsidiary of Ellipso. VirtualGeo played a primary role in the pattern and practice of racketeering as more fully set forth herein.

23.   AirStellar, Inc., is a Delaware company (the successor to Ellipso Private Holdings, Inc. – not to be confused with Ellipso Private Holdings, LLC, described below), with its principal offices in the District of Columbia.  AirStellar is a wholly owned subsidiary of Ellipso.  AirStellar holds an 80% interest in MCHI.

24.   Ellipso Private Holdings, LLC., ("Private Holdings") is a Delaware Limited Liability company with its principal offices in the District of Columbia.  The Castiels hold sixty-five percent (65%) of the shares in Private Holdings with the balance held by friends or other members of the Castiel Family.  Private Holdings controls Ellipso, holding sixty five percent (65%) of Ellipso's outstanding shares.  The Castiel's hold additional Ellipso shares.

25.   Virtual Geo Holdings, LLC., ("VGHI") is a Delaware Limited Liability company with its principal offices in the District of Columbia.  The Castiels hold sixty-two percent

(62%) of the shares in VGHI.  Collectively, the Castiels, Private Holdings and VGHI hold 75% of Ellipso's outstanding shares.

26.   ESBH, Inc., ("ESBH"), is a Delaware corporation with its principal offices in the District of Columbia.  It is a wholly owned subsidiary of MCHI.

27.   INEVA.COM, Ellipsat Corporation and Ellipsat International are all Delaware corporations with their principal offices in Washington DC and are subsidiaries of Un-named Defendant Ellipso, which were previously used by the Castiels in their schemes. On information and belief, none of these companies are currently operating entities.

28.   Un-named Defendant, Ellipso, Inc., ("Ellipso"), is a Delaware corporation with its principal offices in Washington, D.C.  Ellipso holds all of the shares of VirtualGeo, and AirStellar, and 20% of the shares of MCHI.  Ellipso plays a prominent role in the racketeering activities asserted herein.   Ellipso is an un-named Defendant as it is currently in receivership pursuant to the United States Bankruptcy Code, *11 U.S.C. § 1001, et seq*.  Plaintiffs are filing, commensurate with this Complaint, a Motion to Withdraw the Reference of this lawsuit against Ellipso from the bankruptcy court pursuant to 28 U.S.C. § 157, to permit Plaintiffs to join Ellipso as a Defendant herein.

29.   Each of these business entities is co-located at the same address in the District of Columbia.  D.Castiel is the Chief Executive Officer and Corporate Treasurer of each. The corporate identities of each are co-mingled, as the only entity with a bank account is Ellipso; so that corporate operations, moneys and assets are not kept separate.   All business records for every company are maintained on D.Castiel's personal laptop computer, or on Cameran Castiel's computer, to which only they have access.  None of these companies has any employees other than David Castiel.

*30.* The Castiels maintain absolute control over each of these business entities through the following mechanism:

    a. The Castiels hold controlling interest in Private Holdings and VGHI

    b. Private Holdings and VGHI hold controlling interest in Ellipso.

    c. Ellipso holds complete and exclusive ownership of VirtualGeo and AirStellar

    d. AirStellar holds 80%, and Ellipso 20% of MCHI shares, thus Ellipso controls indirectly all shares of MCHI.

    e. MCHI holds all shares of ESBH.

*31.* Ownership chart.



**DEFENDANTS -  CORPORATE OFFICERS AND DIRECTORS:**

*32.* <u>Juan Tomassoni</u>, ("Tomassoni"), is an Argentine national with a house in Reston, Virginia.  His immigration status is unknown at this time.  Tomassoni was a consultant to

Ellipso with a commitment to become a corporate vice president. Tomassoni played a major role in Ellipso's provision of telephony audiotext services (pornography and gambling) as described herein from which he received moneys and other valuable consideration.

33. James Bailey, ("Bailey"), is a member of the bar of the state of Minnesota, and a resident of Arlington, Virginia. Bailey served as acting general counsel of Ellipso, and perhaps other of the corporate Defendants herein, during several of the "bust out" schemes described in this pleading. On information and belief, Bailey colluded with the Castiels, Ellipso, VGHI, ESBH and MCHI in a fraudulent lawsuit against ICO Global, a publicly traded company controlled by Bill Gates and Craig McCaw. *Ellipso, Inc. v. ICO Global Communications (Holdings), Ltd., No. 2006 CA 008684 B, Superior Court for the District of Columbia.* Bailey also participated in a series of specious lawsuits brought by Ellipso and MCHI against former employees who were owed back salary and other compensation including Richard Inciardi, Richard Knowlton, John Naughton, and others. In one of these cases Judge Robertson found that the action that Ellipso brought was "quintessentially vexatious". *Ellipso v. John Draim, No. Case No. 1:06cv01373 (JR), United States District Court for the District of Columbia.* [A copy of that Order is attached as Exhibit 2, and is incorporated as if fully set forth herein by reference.]. Bailey has also submitted a fraudulent proof of claim in Ellipso's pending bankruptcy proceeding, all as more fully set forth herein. Bailey received compensation derived from the Defendants' illicit activities.

34. Gerald Helman, ("Helman"), is a resident of Alexandria, Virginia, and at all times relevant hereto was and is a Vice President of Ellipso, and MCHI, and a member of the

Board of Managers of VirtualGeo.   Helman was instrumental in obtaining the authorization from the International Telecommunication Union ("ITU") for Ellipso to operate the telephony service which was subsequently used to provide the audiotext products.  Helman received a portion of the revenues from those audiotext services. (The ITU is the international regulatory body in Geneva, Switzerland, which oversees international telecommunications protocols.)  Helman has submitted a fraudulent proof of claim in the pending Ellipso bankruptcy proceeding in the United States Bankruptcy Court for the District of Columbia, *In re: Ellipso, Inc. (Debtor) No. 09-0148.*

35.  James Hackney, ("Hackney"), was a resident of Washington DC at the time of being a business consultant and confidant of the Castiels.  Hackney's full role in the Castiel's scheme is unknown but it can be said that this disbarred attorney, who was found guilty of criminal conduct in his practice of law, was at least involved in the transfer of Ellipso's last remaining cash in early 2007 to the Bahamas and, on information and belief, was instrumental in instigating litigation by Ellipso, VGHI, MCHI and ESBH against a public company wherefrom a three million dollar ($3,000,000.00) settlement  was diverted from MCHI in 2008.  Most of this money ended up in the Castiels' bank accounts, thus avoiding payment of outstanding judgments which were pending against MCHI.

36.  Richard Burt, ("Burt"), is a resident of Washington, D.C., and at all times relevant hereto was a member of the Board of Directors of Ellipso.  Burt either a) authorized the racketeering and other illicit activities engage in by Ellipso and the other Defendants as set forth herein; or b) failed to exercise his responsibilities as a member of the Board of Directors; thereby permitting Ellipso and the other Defendants to engage in these illicit

activities.  Burt received compensation for his services on Ellipso's Board of Directors, which was derived, at least in part, from these illicit activities.

*37.*  Michael Taylor, ("Taylor"), is a resident of Boston, Massachusetts.  Taylor was a member of the Ellipso Board of Directors until sometime in 2008.  Taylor either a) authorized the racketeering and other illicit activities engage in by Ellipso and the other Defendants as set forth herein; or b) failed to exercise his responsibilities as a member of the Board of Directors; thereby permitting Ellipso and the other Defendants to engage in these illicit activities.  Taylor received compensation for his services on Ellipso's Board of Directors, which was derived, at least in part, from these illicit activities.

*38.*  Linda Awkard and Linda Awkard and Associates, Chartered, (collectively "Awkard"), served as General Counsel of Ellipso, and on information and belief each of the other Castiel Companies, from and after June 2005.  Awkard is a resident of Bethesda, Maryland, and Linda Awkard and Associates, Chartered, is an unincorporated professional corporation with offices in the District of Columbia.  On information and belief, Awkard is the only member and/or employee of Linda Awkard and Associates, Chartered.  Awkard is a member of the bar of the District of Columbia.  Awkard, together with the Castiels, was the principal architect and corporate counsel who instituted the "bad faith" lawsuit against Plaintiffs in June 2005, *Ellipso v. Mann, Id.*   In that proceeding Awkard *inter alia*:

<blockquote>

a.   submitted false pleadings, in the United States District Court and the United States Court of Appeals;

b.   suborned perjury;

c.   needlessly and vexatiously multiplied and expanded the litigation;

</blockquote>

    d.    obstructed justice by aiding and abetting the destruction and concealment of evidence and the falsification of corporate documents;

*39.* In 2008-09, in a proceeding before the American Arbitration Association, *The Registry Solutions Company v. Ellipso, No. 164940052308,* Awkard submitted forged documents, concealed evidence, and suborned perjury. Awkard was instrumental in implementing various schemes of the Castiel's as set for the herein. Awkard specifically assisted in the concealment of these schemes. For each of these actions Awkard received financial and other benefits derived from the illicit activities. Awkard now seeks additional compensation by filing a fraudulent proof of claim in the United States Bankruptcy Court for the District of Columbia in, *In re: Ellipso, No. 09-0148, Id.*

**THE ATTORNEY DEFENDANTS:**

*40.* <u>Mark S. Guberman</u>, ("Guberman"), is a disbarred attorney and a resident of Bethesda, Maryland. In June 2005, Guberman prepared and filed the "bad faith" lawsuit against Plaintiffs, *Ellipso v. Mann, Id.* In so doing Guberman knowingly filed fraudulent pleadings and suborned perjury. At that time Guberman was a member of the law firm of Leftwich & Ludaway, LLP. In the spring of 2006, Guberman was disbarred by the State of Maryland, and perhaps other jurisdictions as well, for falsifying the stamps of the Clerk of Court on documents that were never filed. On information and belief, the Castiels and Ellipso continued to employ Guberman following his disbarment. Guberman received payment for his participation in the "bad faith" lawsuit and for the other services he performed for the racketeering enterprise as set forth herein.

*41.* <u>Natalie Ludaway</u>, ("Ludaway"), is resident of, and a member of the bar of, the District of Columbia. Ludaway is a principal in the law firm of Leftwich & Ludaway,

LLP. Ludaway, together with Guberman and Awkard, filed the "bad faith" lawsuit against Plaintiffs, *Ellipso v. Mann, Id.* In filing and prosecuting that "bad faith" law suit, Ludaway, *inter alia:*

> a) submitted false pleadings, in the United States District Court and the United States Court of Appeals;
>
> b) suborned perjury;
>
> c) needlessly and vexatiously multiplied and expanded the litigation;
>
> d) obstructed justice by aiding and abetting the destruction and concealment of evidence.

42. Ludaway received financial benefits for the performance of these illegal acts on behalf of the other Defendants in furtherance of the racketeering activities as set forth herein.

43. <u>Mathew Goodman</u>, ("Goodman"), is a resident of Bethesda, Maryland, a member of the bar of the District of Columbia. At all times relevant hereto, Goodman was a member of the law firm of Leftwich & Ludaway. Following Guberman's disbarment, Goodman became the principal trial counsel on the "bad faith" law suit, *Ellipso v. Mann, Id.* In furtherance of that illicit action, Goodman, *inter alia:*

> a) submitted false pleadings, in the United States District Court and the United States Court of Appeals
>
> b) suborned perjury;
>
> c) needlessly and vexatiously multiplied and expanded the litigation;
>
> d) obstructed justice by aiding and abetting the destruction and concealment of evidence.

*44.* Goodman received financial benefits for the performance of these illegal acts on behalf of the other Defendants in furtherance of the racketeering activities as set forth herein.

*45.* Leftwich & Ludaway, LLP, ("L&L"), is a professional limited liability company, organized pursuant to the laws of the District of Columbia, with offices in the District of Columbia. Guberman, Ludaway, and Goodman were, or are, members of L&L during the times specified herein. The acts of Guberman, Ludaway, and Goodman are attributable to L&L by virtue of *respondent superior.* L&L received payment for the illicit actions of its members as set forth herein.

*46.* Venessa Carpenter Lourie and Vanessa Carpenter Lourie, LLP, (collectively "Lourie"), succeeded Goodman, Ludaway, and L&L as counsel for Ellipso in the "bad faith" lawsuit, *Ellipso v. Mann, Id.,* in October 2007. In furtherance of that illicit action, Lourie, *inter alia:*

    a. submitted false pleadings, in the United States District Court and the United States Court of Appeals

    b. suborned perjury;

    c. needlessly and vexatiously multiplied and expanded the litigation;

    d. obstructed justice by aiding and abetting the destruction and concealment of evidence.

In 2008-09, in a proceeding before the American Arbitration Association, *The Registry Solutions Company v. Ellipso, No. 164940052308,* Lourie submitted forged documents, concealed evidence, and suborned perjury. Lourie specifically assisted in the concealment of evidence of the theft of moneys belonging to TRSC. For each of these

actions Lourie received financial and other benefits derived, at least in part, from the illicit activities.

**DEFENDANT - T.D.AMERITRADE:**

*47.* <u>T.D.Ameritrade</u>, ("TDAm"), is a federally chartered brokerage firm and bank organized pursuant to the laws of Delaware, with offices in the District of Columbia.  The District of Columbia Office of TDAm knowingly and willfully assisted Ellipso, and the Castiels, in evading a lawful court order of the United States District Court for the District of Columbia, which pursuant to the "bad faith" law suit, *Ellipso v. Mann, Id.,* ordered the seizure of certain moneys and securities of Ellipso held by TDAm.  As a consequence of the actions of TDAm, the Castiels were able to convert these assets to their own use, all as set forth more fully herein.  TDAm received compensation, including account fees and commissions from the sale of these securities that it had enabled Ellipso/Castiels to hide from the proscriptions of the court's seizure order.

*48.* <u>Bo</u> <u>Belinsky</u>, ("Belinsky"), is a resident of the District of Columbia and the manager of TDAm's Washington, D.C. Office.  Belinsky is the TDAm Officer who directed and implemented the evasion of the court order by Ellipso/Castiels; for which he received compensation and other benefits.

**DEFENDANT - BUTZEL, LONG, TIGHE, PATTON, PLLP:**

*49.* <u>Butzel,</u> <u>Long,</u> <u>Tighe,</u> <u>Patton,</u> <u>LLP</u>, ("BLTP"), [formerly Tighe, Patton, Armstrong, Teasdale, LLP], is a professional corporation organized pursuant to the laws of the District of Columbia, whose principal office is in the District of Columbia.  BLTP has represented the Castiels and their companies since at least 2002, and continues that representation today.  The actions of BLTP's members are attributable to BLTP by virtue

of *respondent superior.* BLTP received, and continues to receive, payments for the illicit actions of its members in furtherance of the racketeering activities of the Defendants, all as set forth herein.

*50.* Thomas Patton, ("Patton"), is a resident of the District of Columbia and a member of the District of Columbia bar. At all times relevant hereto, Patton has been, and continues to be, a member of BLTP. As long time counsel to the Castiels and their companies, Patton, on information and belief, was aware, and had the documentation from which he should have been aware, of the various schemes which the Castiels and their companies were employing in furtherance of the racketeering activities, all as set forth more fully herein. Specifically, Patton and BLTP prosecuted the "quintessentially vexatious" lawsuit against John Draim, *Ellipso v. Draim, Id.,* as well as participated in the bankruptcy crimes set forth below. Patton received remuneration for these activities, derived, at least in part, from the illicit racketeering activities.

*51.* Kermit Rosenberg, ("Rosenberg"), is a resident of the District of Columbia and a member of the District of Columbia bar. At all times relevant hereto, Rosenberg has been, and continues to be, a member of BLTP. Rosenberg is principal counsel to Ellipso in its current bankruptcy, *In re: Ellipso, Inc., (Debtor), No. 09-0148, United States Bankruptcy Court for the District of Columbia.* In that proceeding, Rosenberg, *inter alia:*

 a) Has filed, or has caused to be filed, false schedules, pleadings, and financial statements.

 b) Has filed five false statements of the financial transactions between BLTP and Ellipso/Castiels.

 c) Has accepted an illegal post petition payment of a pre-petition debt, and then misrepresented to the United States Bankruptcy Court that these funds were in BLTP's trust account.

d) Has made material misstatements of fact to obtain extensions of statutory deadlines.

e) Has filed of caused to be filed false proofs of claim and/or has knowingly failed to file objections of fraudulent proofs of claim.

f) Has obstructed justice by concealing financial and other information ordered produced by the United States Bankruptcy Court.

*52.* Rosenberg has received remuneration for these activities, derived, at least in part, from the illicit racketeering activities of Ellipso and the Castiels.

*53.* <u>Neal Goldfarb</u>, ("Goldfarb") is a resident of the District of Columbia and a member of the District of Columbia bar. At all times relevant hereto, Goldfarb has been, and continues to be, a member of BLTP.  Goldfarb became principal trial counsel for Ellipso in the "bad faith" law suit, *Ellipso v. Mann, Id.,* in February 2009, following Ellipso's bankruptcy filing.  By entering his appearance in that matter, Goldfarb as well as BLTP, adopted and became responsible for all the false pleadings and other malfeasance committed in that case by the Defendants herein.  Goldfarb and BLTP have affirmatively adopted these false pleadings as their own by continuing to knowingly assert false and fraudulent positions on behalf of Ellipso/Castiels by filing false pleadings.  Goldfarb is co-counsel in the Ellipso bankruptcy and equally guilty of the participating in the racketeering activities of Rosenberg, Patton, and BLTP attendant to that proceeding, as set forth herein.  In March 2009, Goldfarb and BLTP entered their appearance in the arbitration case, *The Registry Solutions Company v. Ellipso, Id.,* and thereby adopted Ellipso's falsehoods made in that matter by the Castiels, Awkard, and Lourie.  In that arbitration proceeding, Goldfarb and BLTP continued to assert the same fraudulent positions, based on the same fraudulent testimony and evidence, as that previously advanced.  Goldfarb and BLTP have received, and continue to receive,

moneys and other things of value derived from the pattern and practice of racketeering of the Castiels, their companies, and the other Defendants.

**JOHN DOE DEFENDANTS:**

*54.*   John Doe(s), ("Doe(s)").   There may be other(s) who participated in, and received benefits from, the pattern and practice of racketeering set forth herein, who are unknown to Plaintiffs at this time.   Should discovery or other investigation reveal the identity of these individuals/companies/organizations, Plaintiffs will seek to amend this Complaint to include those as Defendants as well.


**STATEMENT OF FACTS**
**(BACKGROUND FACTS)**


**THE FORMATION OF MOBILE COMMUNICATIONS HOLDINGS, INC. AND ELLIPSO, INC., AND DEVELOPMENT OF THE SATELLITE TECHNOLOGY:**

*55.*   Mobile Communications Holdings, Inc., ("MCHI"), is a mobile satellite telecommunications service company founded by David Castiel, ("D.Castiel"), and other family and friends, in 1989.   MCHI developed a patented technology for the deployment of an elliptical satellite communications system which it named Ellipso, the original ideas having come from a company called Interferometrics, which the Castiels sued in order to gain outright control of the technology.    In May 1998, D.Castiel formed Ellipso, Inc., ("Ellipso").   By reverse merger/restructuring, MCHI became a wholly owned subsidiary of Ellipso in 1998.

*56.*   D.Castiel received almost one hundred million dollars ($100,000,000.00) in investment in the development of an elliptical orbital satellite constellation system.

Ellipso, through its subsidiaries, holds more than twenty patents for this technology. Although Ellipso/MCHI developed the technology, and filed with the Federal Communications Commission, (FCC), for authorization to construct and deploy the satellite system, Ellipso/MCHI never secured any funding for launch of the system, and have never had any revenues from their proposed satellite system.

57.    D.Castiel is, and always has been, the principal owner and CEO of both MCHI and Ellipso.  D.Castiel, and his spouse, Cameran Castiel, ("C.Castiel"), personally control seventy-five percent (75%) of Ellipso's shares through their controlling interest in Ellipso Private Holdings, LLC, ("Private Holdings"), a family corporation in which the Castiels hold two thirds (2/3s) of the shares; and Virtual Geo Holdings, Inc., ("VGHI"), also a family corporation in which the Castiels' hold all interests. The Castiels exercise complete control over MCHI through Ellipso, which holds twenty percent (20%) of the MCHI shares, and their one hundred percent (100%) ownership of AirStellar, which holds the balance (eighty percent, 80%) of the MCHI shares.

**VIRTUAL GEO SATELLITE, LLC, AND THE START OF THE PATTERN AND PRACTICE:**

58.    In 1999, the satellite communications industry suffered a severe down turn.  To secure additional funding for development of its satellite business, Ellipso created another company, Virtual GeoSatellite, LLC, ("VirtualGeo").  Certain of the patented technology was placed into VirtualGeo to secure an investment of approximately nine million five hundred thousand dollars ($9,500,000.00) for development of the technology.

59.    On information and belief, the funds were misappropriated by the Castiels; resulting in substantial litigation with the investor, *See VGS, INC., v. CASTIEL, Court of*

*Chancery of Delaware, 2000. 2000 WL 1277372.; MCHI et at. v. Draim. Case No. 01-08202 (JR)(D.C.D.C.); Elljpso Inc. et al. v. Inciardi. Case No. 02-0433 (JR)(D.C.D.C.);Virtual Geosatellite. LLC. et al. v. Sahagen et al.. Case No. 3286-00 (Super. Ct. D.C.), Peter Sahagen et al. v. Castiel, Ellipso Inc. , et al. (Supreme Ct. of NY, Index No. 603117/07)*

60.    After years of litigation, the investor tired of the legal fees and settled the matter by relinquishing any interest in VirtualGeo, and received nothing for his $9,500,000.00 investment.  VirtualGeo became a wholly owned subsidiary of Ellipso.  The Castiels had found a formula for obtaining money for nothing through misuse of the judicial process.

61.    In this litigation, D.Castiel, Ellipso, Bailey, assisted by others unknown at this time, wrongfully obtained confidential attorney client communications between the investor and his counsel.  When the perpetrators attempted to introduce these attorney client communications in to evidence, the court refused to admit them and sanctioned the perpetrators.  [Roy, there is a court order on this in the US District court case – look in docket, and get quote.]

62.    Commensurate with the litigation with the disgruntled investor, every corporate officer at Ellipso resigned except Defendants Helman and Bailey, and of course, D.Castiel.  Ellipso and/or MCHI subsequently sued each of these former employees (who were owed back pay, benefits and bonuses). *See, Mobile Communication, et al v. Draim Case No: 1:02-cv-00112-JCC (D.C. ED.Va) MOBILE COMMUNICATIONS HOLDINGS, INC. et al v. DRAIM Case No. : 1:02-cv-00775-JR B (D.C.D.C.); ELLIPSO, INC. Vs. DRAIM, JOHN E 2006 CA 005563 (D.C. Sup. Ct.) Draim v. Virtual Geosatellite. LLC, et al. Case No. 01·1588- A (JR) (D.C.D.C.) MOBILE*

*COMMUNICATIONS HOLDINGS, INC. et al v. DRAIM CASE #: 1:01-cv-02427-RWR (D.C.D.C.);* ELLIPSO, INC. et al v. DRAIM CASE #: 1:06-cv-01373-JR (D.C.D.C.); *Elljpso Inc. et al. v. Inciardi. Case No. 02-0433 (JR)(D.C.D.C* accusing each of breach of contract, breach of fiduciary duty, conversion, fraud, breach of loyalty, violations of trade secrets statutes, and various other claims in "kitchen sink" complaints.  Lacking the resources to defend against these multiplicious claims, all but one of these former employees settled with Ellipso by waiving their legal rights to back pay, benefits, and bonuses.

*63.*    Only Captain John Draim persisted in defending himself, eventually obtaining a judgment and the finding that Ellipso's law suits against him were "quintessentially vexatious", *See, Ellipso v. Draim, Id.*   Draim still has not collected a dime from anyone on his judgments due to continued fraud and theft by the Castiels, as set forth more fully below.

*64.*    Another employee who attempted to obtain redress from Ellipso was Lori Lincoln.  She had provided sexual favors to D.Castiel, including traveling to Paris with him.  D.Castiel had reneged on his promise to make her a vice president of Ellipso. D.Castiel bragged about beating that suit by falsely testifying in his deposition in that Ms. Lincoln, "was a Spanish whore."  Ms. Lincoln dismissed her suit shortly thereafter.

*65.*    The Castiels had found a formula for avoiding payment of their just debts by corruptly employing the judicial system.

*66.*    During this time, the Castiels employed this same corrupt technique on the home front to avoid payment of tens of thousands of dollars to the gardener who had

landscaped the grounds of their mansion on Indian Lane in northwest Washington, D.C., *See, cite gardener case in Superior Ct. D.C.*

**THE RAMONE AFFAIR:**

*67.*   During this time frame, D.Castiel, MCHI, and Ellipso became involved with an individual known only as Ramone, no last name.   Ramone's nationality and allegiance were never determined.   Ramone approached D.Castiel/MCHI/Ellipso with a proposal to build a missile launch facility in Indonesia for the purpose of putting the Ellipso constellation of satellites into orbit.   Ramone arrived in Washington, D.C. "with a suitcase full of cash."

*68.*   Ramone wined and dined D.Castiel and other Ellipso executives, including providing specialized "hostesses" to entertain the guests at a function at the Willard Hotel on Pennsylvania Avenue, one block from the White House.   Among the guests who accompanied Ramone were several Russian Generals.   D.Castiel attended this, and other, functions sponsored by Ramone.

*69.*   Subsequently Ramone, D.Castiel, and other Ellipso executives traveled to Las Vegas, where the debauchery continued.   Thereafter, Ramone provided a private plane, and D.Castiel, Ramone, and the Russian Generals traveled to various foreign locations, including the United Soviet Socialist Republic, where the guests were similarly "entertained."   During this trip one Russian General gave D.Castiel a pair of Russian military pistols and other "gifts."

*70.*   After the trip around the world, Ramone disappeared.   The missile launch facility in Indonesia was never built.   Ramone and D.Castiel were investigated by the United States Attorney's Office in the District of Columbia concerning the trips with Ramone,

and for illegal campaign contributions.   (David Castiel was "a person of interest.")
D.Castiel was not indicted.   The law firm of Bryan, Cave, LLP, which defended
D.Castiel, was never paid.   D.Castiel kept the Russian military pistols.   On information
and belief, these pistols were never registered.

### THE MCHI, ESBH, AND ICO GLOBAL TRANSACTION:

*71.*   International Global Communications Holdings, Inc., ("ICO Global"), is a
telecommunications company whose principal owners are Bill Gates (Microsoft founder)
and Craig McCaw (the pioneer of the cell phone business).   In 2001, ICO Global entered
into a contract with Ellipso to purchase MCHI's technology plus a satellite operator's
license MCHI had received from the FCC.   In December 2001, an initial payment of one
million dollars ($1,000,000.00) plus 492,611 shares of ICO Global common stock was
issued to Ellipso for the option to purchase the relevant assets of MCHI.   [As set forth
below, these 492,611 shares became the subject of a subsequent scheme to defraud
defendant MannTech.]

*72.*   ICO Global wished to purchase MCHI's technology and license for cash and
additional stock in ICO Global.   However, due to the law suits with the disgruntled
investor against VirtualGeo and MCHI discussed above, the transaction was structured so
that MCHI would transfer the technology and operator license assets, which ICO Global
wanted to acquire, to a new entity, ESBH, Inc., ("ESBH").   [ESBH is an acronym for
Ellipso S-Band Holdings, the spectrum frequency band which ICO Global desired to
buy.]   ICO Global would then acquire ESBH from MCHI in exchange for cash and stock
in ICO Global at a First and Second Closing, while avoiding any exposure to the law
suits which the disgruntled investor had against MCHI. [See footnote #12 in to Debtor's

Second Amended Disclosure Statement dated October 5, 2009 in Ellipso's bankruptcy in the DC court case 09-00148].

*73.*   Pursuant to the First Closing under that agreement, one million five hundred seventy one thousand  (1,571,547) shares of ICO Global common stock were issued to MCHI in October 2002 in return for ICO receiving shares in ESBH.   [This stock subsequently became the subject of bankruptcy fraud when MCHI filed for bankruptcy protection on May 12, 2003, without listing this stock as an asset of MCHI.   This criminal fraud is described more fully *infra.*]

*74.*   The balance of the purchase price consisting of approximately two million two hundred thousand (2,200,000) shares of ICO Global common stock was to be paid at a Second Closing which never occurred.   The FCC canceled the satellite operator license that MCHI had dropped down to ESBH and ICO Global did not issue the additional 2,200,000 shares of ICO Global common stock to MCHI.   [This matter became the subject of a fraudulent law suit by Ellipso against ICO Global, *Ellipso, Inc. v. International Global Communications Holdings, Inc., No. 2006 CA 008684, Superior Court for the District of Columbia,* as more fully set forth below.]

**THE MCHI BANKRUPTCY FRAUD AND SUBSEQUENT THEFT OF THE ICO GLOBAL STOCK FROM MCHI:**

*75.*   The fortunes of the enterprise continued to decline, and it's landlord obtained a one hundred twenty thousand dollar, ($120,000.00), judgment for back due rent against MCHI in April 2003 (See *Two LaFayette Centre LLC VS. Mobile Communications Holdings Inc* 2003 LTB 008096 (DC Sup. Ct.) To avoid payment of the judgment and the more than half a million dollar a year lease on the office space at Lafayette Square used by the enterprise, MCHI filed for bankruptcy protection under 11 U.S.C. § 1001, et seq.,

*In re: Mobile Communications Holdings, Inc., No. 03-0848, United States Bankruptcy Court for the District of Columbia.* Although listing a small number of Class A ICO Global stock, the Schedules of Assets filed in that matter did not list the one million five hundred seventy one thousand five hundred forty seven (1,571,547) shares of ICO Global common stock which MCHI held on that date and continued to hold until 2004. A copy of that Schedule is attached as Exhibit 3, and incorporated by reference as if fully set forth herein.

76. On May 12, 2003, the 1,571,574 shares were trading for approximately sixty cents ($0.60) per share and thus had a value exceeding one million dollars. [In subsequent filings in other courts D.Castiel/Ellipso/MCHI have asserted that the value of the stock on that date exceeded fifteen million dollars ($15,000,000.00), *Ellipso v. ICO Global, Superior Court for the District of Columbia, Id.;* or was four million five hundred thousand dollars, ($4,500,000.00), *In re: Ellipso (Debtor), Bkrcy Ct. for D.C., Id.)*

77. Relying on the fraudulent bankruptcy schedules filed by MCHI showing no assets from which to obtain payment on the lease, the landlord, Equity Office, agreed to forgive several hundred thousand dollars in back rent as well as all future rent in return for a prompt vacation of the space by the enterprise. Once this was accomplished, MCHI dismissed its bankruptcy proceeding.

78. Having concealed the 1,571,574 shares of ICO Global stock from MCHI's creditors, which included Captain John Draim, D.Castiel needed to sell them but show the revenue elsewhere so covering up his crime. He achieved this by simply transferring the subject stock to Ellipso. To cook the books, Castiel created a fictitious debt from MCHI to Ellipso against which Castiel had MCHI 'pay' $1,392,150 in 2004 and

reporting this to the IRS in 2004 on Schedule M-1 "Income Not Recorded on Books".  If he had not done this, Castiel's failing to report MCHI's ownership of ICO Global Common Stock in MCHI's 2003 bankruptcy would have been obvious.  Having illegally transferred this multi-million dollar asset to Ellipso, commencing in October 2004 and continuing for approximately two years thereafter, D.Castiel authorized repeated sales and transfers of these ICO Global shares from MCHI's brokerage account at UBS Financial Services, (account number WS 47698 PM) and directed that the proceeds from the sales and unauthorized transfer of this stock be deposited in the account of Ellipso (UBS account number WS-31501).

*79.*    One each occasion of this conversion of the assets of MCHI, D.Castiel employed the instruments of interstate commerce including the telephone, mails, and internet systems.  A statement detailing each incident of fraudulent conversion (approximately 265) is set forth on Exhibit 4, attached hereto and incorporated as if fully set forth herein.

*80.*    To conceal these unauthorized transfers of MCHI's assets, Ellipso and the other corporate defendants filed fraudulent state and federal income tax returns for 2004, 2005, 2006 and 2007.

*81.*    The proceeds from these thefts of MCHI's assets were used to stave off Ellipso's bankruptcy, maintaining and sustaining the operation and control of the enterprise that had become core to the Castiels schemes, including substantial payments to the Castiels as well as other Defendants.  A statement detailing each transfer of funds, which were the proceeds of the thefts of MCHI's assets, to or for the benefit of the Castiels and other Defendants (approximately 500), is set forth on Exhibit 5, attached hereto and incorporated as if fully set forth herein.

**THE ENTERPRISES' SITUATION IN THE FALL OF 2003:**

*82.*   In the fall of 2003, the enterprise had run out of money.   Although it had no employees and officed from a post office box, the Castiels still required in excess of twenty five thousand dollars ($25,000.00) a month to sustain the family's extravagant life style.   Additionally, the enterprise was incurring tens of thousands of dollars a month in litigation costs arising from the series of suits by the disgruntled investor, noted *supra.* The enterprise's situation was desperate as both the Castiels and the businesses had immediate pressing needs for cash.

*83.*   The enterprise controlled numerous patents, but they had no immediate value. There were the 1,571,547 shares of ICO Global stock in MCH's name, but the sale of this stock was restricted for two years pursuant to SEC regulations, until October 2004. However, in December 2003, the restriction expired on the certificate for 492,611 ICOG shares, which had been issued to Ellipso.   It was these shares that Ellipso transferred to MannTech to secure the loan of ninety thousand dollars ($90, 000, 00), as more fully discussed below.

*84.*   Ellipso also had the 881-2 and 881-3 country codes from the ITU.   A handful of other satellite companies, e.g. Iridium, held other such numbers.   Ellipso's problem was that absent a satellite system, the numbers would be revoked.   However, in the fall of 2003, Ellipso applied for and obtained permission from the ITU to employ its 881 numbers to initiate a precursor service, in anticipation of a later launch of its satellite operations.

*85.*   The business concept was that the numbers could be placed in service utilizing existing telephone service providers and facilities.   Ellipso would need to make only a

nominal investment in facilities (perhaps as little as leasing one switch partition). Because this was a new number series, Ellipso could sell vanity numbers, [e.g. 881-2 HILTON, 881-2 FRANCE, 881-2 BANKONE], which could be sold at a premium. The numbers could also be sold to individuals. Additional value added services could also be available with the numbers such as world wide call forwarding, internet and email tie-ins (E-num capacity), international "follow-me" service, one number roaming bypass, and other services. It would be the only number that anyone would ever need. Castiel/Ellipso projected the sale of fifty million (50,000,000) vanity numbers at three dollars ($3.00) per month, for annual revenues of one billion, eight hundred million dollars ($1,800,000,000.00).

*86.*   Mann and Patterson were interested in pursuing this opportunity.

**THE MANNTECH LOAN TO ELLIPSO:**

*87.*   The enterprise needed a financial partner to avoid bankruptcy and enable it to pursue the 881 business.   TRSC and MannTech became that financial partner. MannTech provided an immediate cash infusion of ninety thousand dollars ($90,000.00), and TRSC committed to provide twelve thousand five hundred dollars ($12,500.00) per month in royalty payments in anticipation of the start of the 881 telephone services.

*88.*   MannTech made a $90,000.00 stock margin loan to Ellipso, based on the ICO Global stock certificate for 491,611 shares of common stock, which was held in Ellipso's name.   In a stock margin loan, the lender advances funds against the value of a stock certificate; usually 20% to 35% of the current value.   Here MannTech advanced approximately 40% of the value of the ICO Global shares, which were then trading at approximately fifty-five cents ($0.55) a share.

*89.*    The loan is non recourse to the borrower (Ellipso) and is secured solely by the stock (ICO Global) certificate.  The borrower (Ellipso) transfers ownership of the stock to the lender, who protects his position by immediately selling enough shares to cover the loan.  The loan agreement provides that after three years the borrower can repay the loan and retrieve the stock, which he would do if the stock at that time was worth more than the loan amount; or the borrower can opt not to repay the loan and forfeit the stock, which he would do if the stock at that time was worth less than the loan amount.

*90.*    The loan agreement further provides that the borrower and the lender will share in any increase in the value of the stock during the course of the loan.  It is really a no lose proposition for both parties.  An essential element of any stock margin loan is the ability for the lender to protect his position by immediately liquidating sufficient shares to cover the loan amount.

*91.*    The MannTech/Ellipso stock margin loan closed in February 2004. Ellipso/Castiel never provided the requisite documentation for MannTech to protect its position by liquidating any of the 491,611 ICO Global shares – refusing to provide the requisite authorization from Ellipso's Board of Directors.  No payment of either interest or principal was ever made by Ellipso on the loan from MannTech.  Between February and October 2004, the trading price of the ICO Global shares fell from approximately fifty-five cents ($0.55) per share to less than five cents (<0.05) per share.

*92.*    In October 2004, Ellipso walked away from the loan transaction, opting to make no payments thereon.  *See, Ellipso v. Mann, Id., Opinion and Order,* Exhibit 1, attached. It appears that the enterprise had no intention of relinquishing control of the stock and no intention of repaying the loan.

### D.CASTIEL'S AND ELLIPSO'S FRAUD IN THE LOAN AGREEMENT:

*93.* In the stock margin loan agreement executed by D.Castiel, Ellipso represents,

*inter alia:*

a) In the Loan Agreement

Section 3. Representations and Warranties of Borrower [Ellipso].

3.1 No Liens or Restrictions—The Collateral is free of any restrictions, including restrictive legends. The Collateral is freely tradable and transferable.

3.2 Consents—The Borrower [Ellipso] represents and warrants that no consent of any other party … is required in connection with the execution, delivery and performance of the Loan Agreement.

3.4 Litigation—There is no action or proceeding pending, contemplated or threatened against Borrower [Ellipso] before any court or by any court … which might result in a material adverse change in the financial condition of Borrower [Ellipso].

3.5 No Defaults—Borrower [Ellipso] is not in default in the payment or performance of any of its obligations or in performance of any contract agreement, or other instrument to which he is a party or by which any of his assets or properties may be bound.

b) In the Pledge Agreement:

Section 4. Representations and Warranties.

4.3 No authorization, approval and consent of … any Person are necessary for the execution, delivery, or performance by the Pledgor [Ellipso] of this Agreement or for the validity or enforceability thereof.

*94.* Each of these statements is false. Each of these representations was known to D.Castiel and Ellipso to be false at the time the agreement was executed. D.Castiel and Ellipso made these false statements with the intent that MannTech rely on the truth of these statements. MannTech did reasonably rely on these false statements as the basis for

making the stock margin loan to Ellipso.  MannTech was injured by its reliance on these knowingly false representations of D.Castiel/Ellipso.

*95.*   Chief Judge Royce C. Lamberth, found that because of these material misrepresentations, Ellipso was in default when it executed the stock margin loan agreement with MannTech, *See, Opinion and Order, Ellipso v. Mann,* attached as Exhibit 6, hereto and incorporated by reference as if fully set forth herein.]

*96.*   D.Castiel and Ellipso employed the instruments of interstate commerce including the U.S. Mails, the telephone network, the internet network, and the interstate highway system in perpetrating the fraud on MannTech.

**THE TRSC/ELLIPSO TRANSACTION:**

*97.*   In December 2003, TRSC and Ellipso executed an agreement to implement the 881 telephone services. TRSC was to provide the registry function for the new service by establishing and maintaining a data base of customers, number assignments, routing data, and billing and accounting support.  Ellipso was to provide the operational aspects of the service, securing the transmission and termination of the telephone calls.  Both were to cooperate and assist in securing the success of the business.

*98.*   As noted, the royalty payments by TRSC were to commence immediately upon execution of the agreement with Ellipso, even though no telephone service was operational at that time.  Ellipso/Castiel secured this arrangement by representing that the 881 codes were "loaded" in some 22 countries by KPN, the Dutch telephone company, and the start of service required only the turn of a switch.

*99.*   These representations were false and were known to D.Castiel and Ellipso to be false when they were made.   D.Castiel and Ellipso knowingly made these false

statements with the intent that TRSC rely on said false statements in executing the agreement with Ellipso for 881 telephone service.  TRSC did reasonably rely on these false statements by D.Castiel/Ellipso in executing the TRSC/Ellipso 881 telephone service agreement.  TRSC was injured by its reasonable reliance on D.Castiel's and Ellipso's false statements.

*100.* During calendar year 2004, D.Castiel/Ellipso sent numerous emails, and had numerous telephone and personal conversations with Mann and/or Patterson (in the District of Columbia, in the Commonwealth of Virginia, in the states of New York, Maryland, New Mexico, New Jersey, and South Carolina) in which the representations that the start of the 881 telephone service was eminent were repeatedly made. These statements were false and were known to D.Castiel/Ellipso to be false.  D.Castiel/Ellipso made these false statements with the intent that TRSC/Mann/Patterson rely on these statements.   TRSC/Mann/Patterson did reasonably rely on these knowingly false statements and were injured thereby.

*101.*  In making these false statements and perpetrating the fraud on TRSC, D.Castiel and Ellipso employed the instruments of interstate commerce including the U.S. Mails, the interstate telephone network, the internet network, and the interstate highway system. Attached as Exhibit 11 is a list of the e-mails (approximately 100) which D.Castiel sent to Mann and/or Patterson in furtherance of the scheme to defraud, which is incorporated by reference as if fully set forth herein.

**AUDIOTEXT SERVICE AND THE SUNBURST AGREEMENT:**

*102.* Unknown to TRSC, Ellipso had contracted away to another company, Sunburst Communications, the very rights to the registry function and the attendant revenues that TRSC thought it had purchased.  Castiel/Ellipso had "sold the fighter twice."

*103.* D.Castiel/Ellipso concealed this material fact from TRSC and MannTech, knowing that neither MannTech nor TRSC would enter into the agreements with Ellipso, if it were revealed. Ellipso ultimately received one hundred eighty thousand dollars ($180,000.00) in direct cash payments from TRSC and MannTech as a consequence of this fraudulent concealment of this material fact.

*104.* D.Castiel/Ellipso employed the interstate mails, telephone, internet and highway systems in effectuating this fraud on TRSC and MannTech, as set forth herein.

**ELLIPSO FRAUDULENTLY CONCEALS REVENUES FROM TRSC:**

*105.* Sunburst Communications was not interested in the vanity or other services that the 881 numbers afforded.  It was only interested in using the numbers for "audiotext" services.   Audiotext service is essentially telephone sex talk and/or gambling and is illegal in most jurisdictions.   Unbeknownst to TRSC, Ellipso subsequently operated audiotext service using the 881 numbers it had contracted to TRSC.

*106.* During the trial of *Ellipso v. Mann, Id.,* in July 2008, D.Castiel testified that Ellipso started the 881 telephone service in October 2004 and operated it for three years. D.Castiel further testified that Ellipso received "…almost one million dollars ($1,000,000.00) from this service." (Trial transcript for 7/30/08 p.11).  This was the first that TRSC knew of Ellipso's operation of any 881 telephone service.

*107.* Prior to July 2008, D.Castiel continued to represent to TRSC and to Mann and Patterson that no service had started.  D.Castiel specifically prevented Patterson from

attending a meeting with KPN in New York in November 2004, where Patterson undoubtedly would have learned of the start of the operation of the 881 telephone service. To further conceal the receipt of the revenues to which TRSC was entitled, D.Castiel disingenuously wrote to Mann on December  , 2004, that "…service would start soon…" When TRSC's consultants attempted to contact KPN to coordinate technical issues, D.Castiel intervened and prevented any communication with KPN.

108. On information and belief, Awkard, Lourie, Bailey, Helman, and Tomassoni knew of the revenues received by Ellipso for the 881 telephone service, and actively concealed that knowledge from TRSC.

109. This active concealment, which included court proceedings, of the receipt of the revenues to which TRSC was entitled employed the instruments of interstate commerce.

110. In 2008, TRSC initiated an arbitration proceeding before the American Arbitration Association against Ellipso.  TRSC received an award of its share of the 881 telephone revenues that D.Castiel and Ellipso had stolen.  In that arbitration it was established that Ellipso received in excess of six hundred thousand dollars ($600,000.00) from operation of the 881 audiotext services, *See, Award of the American Arbitration Association, Id.*

111. The revenues stolen from TRSC were used to operate and control the enterprise and/or were taken by the other racketeers including the Castiels, Helman, Awkard, and Tomassoni for their personal enjoyment.

**D.CASTIEL, C.CASTIEL, AND ELLIPSO MISAPPROPRIATE (CONVERT) MONEYS FROM TRSC WHICH WERE ESCROWED FOR DEVELOPMENT OF THE 881 TELEPHONE SERVICES:**

*112.* In April 2004, the TRSC/Ellipso agreement was amended to provide, *inter alia.,* that the monthly payments from TRSC to Ellipso would be increased to twenty-five thousand dollars ($25,000.00); with one half, twelve thousand five hundred dollars ($12,500), to be escrowed and used exclusively for the development of the 881 telephone services. A special account was set up at Sun Trust, and the $12,500.00 payment for May 2004, was deposited into that account.

*113.* D.Castiel and C.Castiel immediately converted those moneys in the Sun Trust account to their personal use including payment of their personal telephone and cell phone bills, Capital One and other credit card bills, and even their personal parking tickets. None of this money was ever spent on development of the 881 telephone services and none of this money has ever been repaid.

*114.* The interstate telephone, banking, internet, and mails were employed by D.Castiel, C.Castiel, and Ellipso to effectuate this conversion of the moneys in the Sun Trust escrow account.

**D.CASTIEL COMMITS PERJURY; AND D.CASTIEL, AWKARD, AND LOURIE CONCEAL EVIDENCE, SUBMIT FRAUDULENT DOCUMENTS, AND SUBORN PERJURY IN THE ARBITRATION WITH TRSC:**

*115.* In the arbitration with TRSC noted above, D.Castiel testified on be half of Ellipso.

In that testimony D.Castiel testified falsely as follows:

a. Castiel repeatedly made false statements regarding the start of 881 service, contradicting his prior sworn testimony and contemporary representations to others.

b. Castiel submitted in discovery a fraudulent document he represented to be a letter he had sent to John Mann in Dec. 7, 2004. This "letter" was never provided in discovery in *Ellipso v. Mann et al, Id.* The letter specifically admits that:

"I [Castiel]relied on Bob [Patterson] represented Ellipso's interests, but he was on your payroll, and held a substantial equity stake in TRSC/Mann Tech as well. I did not find out about this conflict until June 2004, until then neither Bob nor you alerted me to that. This situation is to say the least unorthodox." (Emphasis added)

This directly contradicts his oft repeated assertion that he first knew of Patterson's interest in August 2004. When it was pointed out to him that the document's metadata indicated it had been prepared in Jan. 2009 instead of 5 years prior, he ceased to discuss it.

c. Castiel and others attempted to conceal the extent of 881 revenues until the Arbitrator threatened to use the "million dollar" amount Castiel had previously sworn to in his District Court testimony.

*116.* On information and belief, both Awkard and Lourie knew that these statements were false and solicited this false testimony from D.Castiel.

*117.* In the arbitration TRSC was seeking its share of revenues which Ellipso had received from operation of the 881 telephone business. TRSC knew of one customer, KPN, but did not know that a second customer, Oration Communications, had paid Ellipso as well for the 881 traffic. D.Castiel, and Attorneys Awkard and Lourie concealed the existence of this second source of revenue. TRSC only discovered the existence of these additional revenues at the arbitration hearing; at which the arbitrator ordered Ellipso to produce the hidden documents. Upon examination of these documents during the hearing, TRSC first learned of this theft.

*118.* In discovery prior to the hearing, TRSC had requested, and Ellipso had been required to produce, all documents pertaining to the revenues that Ellipso had received from the 881 service. These documents of the second customer were never produced in discovery, but were actively withheld by Ellipso's counsels, Awkard and Lourie, in concert with D.Castiel.

*119.* Ellipso, D.Castiel, Awkard and Lourie also submitted fraudulent documents to the arbitrator attempting to show that TRSC was not entitled to any payment. TRSC pointed out that the *metadata* on that electronically produced documents showed that they had

been "manufactured" shortly before the arbitration hearing, not five years earlier as represented by D.Castiel, Awkard, Lourie, and Ellipso.

*120.* At the arbitration hearing, D.Castiel attempted to suborn the testimony of one John Page, an executive of Ellipso and AirStellar and former consultant to TRSC. D.Castiel sought to coerce John Page into falsely testifying that while engaged with TRSC he had conspired with the Plaintiffs herein to illegally have Ellipso's codes loaded in secret, and that TRSC had attempted to fraudulently interfere with Ellipso's rights and legitimate contracts with third parties. In fact, it was Ellipso that was concealing its activities and revenues from TRSC. On information and belief, Awkard and Lourie aided and abetted this suborning of perjury.

## D.CASTIEL, ELLIPSO, AND AIRSTELLAR INTENTIONALLY INTERFERE WITH AND DESTROY TRSC'S INVESTMENT WITH JOHN PAGE

*121.* TRSC had an ongoing relationship with John Page ("Page") between 2004-06 which included consulting and joint venture activities to launch a wide range of services dependent on or associated with TRSC's agreement dated December 15, 2003 with Ellipso regarding use of its 881 numbers. D.Castiel, Ellipso, and AirStellar, knew about TRSC's relationship with Page and knew of Page's development with TRSC of an approach to have the Ellipso numbers loaded by a leading global carrier, MCI (now part of Verizon). It is necessary to state here that the 'Vanity Number' service, for which Ellipso and TRSC had agreed to use Ellipso's 8812, required a global carrier to load and connect the calls at a rate of less than five cents ($0.05/min.) per minute to be commercially viable. TRSC and Page had achieved this through their pending contract with MCI.

*122.*  The purpose of Ellipso's vexatious lawsuit against TRSC was to deny TRSC the opportunity to gain revenues under the December 2003 TRSC/Ellipso agreement and to keep the monies TRSC had paid for the rights granted thereunder.  With an agreement in hand for MCI to load 8812 at 'Vanity Number' rates (the "Loading Agreement") which had taken more than six months to effectuate, TRSC learned that MCI was being purchased by Verizon and that if not executed promptly the Loading Agreement would likely be taken off the table by Verizon.  Frustrated by the logjam created by Ellipso's vexatious lawsuit against TRSC and its principals,, Page approached Ellipso in December 29, 2005 to see if Ellipso were amenable to any arrangement with TRSC to  start the 8812 Vanity Service.   Instead of supporting these efforts with TRSC as required in the TRSC/Ellipso agreement, and with detailed knowledge of Page's relationship with TRSC, D.Castiel, Ellipso and Airstellar induced Page to terminate all his activities with TRSC and to become a full-time employee of Ellipso and AirStellar.

*123.*  D.Castiel, Ellipso, and AirStellar thus intentionally interfered with TRSC's relationship with Page to a) exclude TRSC from any revenues planned from reselling MCI (non-8812) call services b) exclude TRSC from any revenues planned from its rights under the Ellipso/TRSC agreement and c) gain unfair business advantage, *inter alia.,* from access to TRSC's trade secrets, business methods, contacts, and CONTRACTS of which Page had detailed knowledge.

*124.*  D.Castiel, Ellipso, and AirStellar intentionally interfered with TRSC's investment in and relationship with Page to initiate and operate the 881 telephone services.  These were the very services which Ellipso was obligated to provide under its agreement with TRSC and upon which TRSC was dependent to realize any return on its investment,

which included almost one hundred thousand dollars ($100,000.00) in royalty payments to Ellipso.  Almost all of the one hundred thousand dollars ($100,000.00) found its way into the Castiels' pockets.  The contract with MCI/Verizon was in final form and ready for execution at the point when Page was enticed to join the enterprise so Castiel could continue to deny TRSC its rights.

*125.*  In March 2009, in the Bankruptcy Court proceedings on Ellipso's bankruptcy, TRSC learned that Ellipso had taken that MCI/Verizon agreement as its own and had entered into an agreement with MCI/Verizon almost identical to that which TRSC had developed with Page.  Ellipso has received, and continues to receive, revenues from that purloined contract.

*126.*  TRSC has suffered injury to its business as a result of this intentional wrongdoing and interference by D.Castiel, Ellipso, and AirStellar.   TRSC's damages have been continuous since 2006. TRSC's damages are ongoing.  Whereas an arbitration process between Ellipso and TRSC concluded in January 2009, D.Castiel, in perpetuation of the enterprise's schemes, had already removed to his own bank account the money available to pay TRSC's arbitration award and caused Ellipso to file for bankruptcy to fraudulently avoid payment to TRSC.

## THE UNITED STATES DISTRICT COURT LAW SUIT, *ELLIPSO, INC. B. JOHN B. MANN, ET AL.*:

*127.*  As noted, Ellipso defaulted on both agreements with MannTech and TRSC. Ellipso never made a single payment of either interest or principal on the loan from MannTech.   Ellipso failed to provide the telephone services which it undertook to provide to TRSC.  In an obvious defensive maneuver, in June 2005, Ellipso brought suit in the United States District Court for the District of Columbia against TRSC, MannTech,

John Mann and Robert Patterson, styled, *Ellipso, Inc. v. John Mann, et al., No. CA 05-1186 (RCL).*

*128.* Ellipso's District Court action accused Mann and Patterson of fraud, breach of fiduciary duty, unconscionability, R.I.C.O., conspiracy, breach of contract, and conversion. These allegations were based on D.Castiel/Ellipso's assertions that they had been defrauded by the fact that Patterson had an equity interest in MannTech (and TRSC), and that Castiel/Ellipso had been unaware of this financial interest. Since Patterson had acted as a consultant to Ellipso, it was asserted that Ellipso had been defrauded.

*129.* Mann/Patterson/MannTech's defense was that D.Castiel/Ellipso knew from the beginning of the transaction that Mann and Patterson jointly owned MannTech since D.Castiel had himself proposed that Patterson be part owner of MannTech and TRSC. Mann/Patterson presented D.Castiel's own emails in which D.Castiel admits knowing of Patterson's interest in MannTech, at least as early as June 2004. With this knowledge, the Court found that D.Castiel/Ellipso ratified the MannTech agreement on August 2, 2004, when they executed the amended agreements with MannTech and TRSC.

*130.* After three years of discovery and seven days of jury trial, Chief Judge Royce C. Lamberth found that Ellipso failed to present any evidence supportive of its claims. All of Ellipso's claims were dismissed with prejudice.

**ELLIPSO/D.CASTIEL PROCURE AN IMPROVIDENTLY GRANTED PRELIMINARY INJUNCTION AGAINST MANNTECH, MANN, AND PATTERSON THROUGH PERJURY AND OBSTRUCTION OF JUSTICE:**

*131.* As part of that District Court action, Ellipso sought and obtained a Preliminary Injunction against MannTech, Mann, and Patterson, prohibiting any further sale of the

ICO Global stock which MannTech held by virtue of Ellipso's default on the loan agreement. Ellipso secured this injunction by falsely testifying in D.Castiel's affidavit that he, and by implication Ellipso, were not aware of Patterson's interest in MannTech.

*132.* When the truth became known to the Court, the Preliminary Injunction was quashed and MannTech was awarded one hundred thousand dollars ($100,000.00) in damages from the improvidently granted restraining order. [Copies of both the Opinion and Order Quashing the Preliminary Injunction, and the Opinion and Order Awarding the Sanctions, are attached as Exhibit 7 and 7a, and incorporated by reference as if fully set forth herein.]

**REPEATED ACTS OF PERJURY COMMITTED BY D.CASTIEL, AND SUBORNED BY ATTORNEYS AWKARD, LOURIE, GOODMAN, LUDAWAY, GUBERMAN, AND LEFTWICH & LUDAWAY:**

*133.* In presenting the fraudulent case to the United States District Court, D.Castiel/Ellipso made numerous material misstatements of fact. D.Castiel/Ellipso first represented to the Court that D.Castiel/Ellipso were unaware of Patterson's ownership in MannTech "before, during, or after" the transaction. (2005 08-16 DE 4-2, Affidavit of David Castiel). When confronted with his own email from October 20, 2004 stating that D.Castie/Ellipso knew of the MannTech ownership in June 2004; D.Castiel Ellipso asserted that the email was ambiguous and that in fact the email only showed that they knew in October 2004, the date of the email.

*134.* D.Castiel/Ellipso also asserted that position to the United States Court of Appeals and thereby successfully defended the Preliminary Injunction.

*135.* Embellishing on their success, D.Castiel/Ellipso then invented the story that in reality, Patterson had "confessed" to his ownership in MannTech in a conversation at

Starbucks on K Street in Washington, D. C., on August 12, 2004.  The date is significant

because it is after the amendments to the MannTech and TRSC agreements that were

executed on August 2, 2004.  [A copy of the Answer to Interrogatories containing this

false statement is attached as Exhibit 8, and incorporated by reference as if fully set forth

herein.]  This same false testimony was repeated by D.Castiel in his deposition (Depo. Tr.

pp. 99-101, May 2, 2007), in testimony at trial, and in numerous pleadings in that United

States District Court matter signed by Awkard, Lourie, Goodman, Guberman, and

Ludaway.

*136.*  When subsequently presented with another D.Castiel email dated November 16,

2004, in which D.Castiel unequivocally admits to knowing of Patterson's ownership

interest in MannTech as of May/June 2004, the trial court found,

> "Now, Mann points to a different email dated November 16, 2004
> from Mr. Castiel to Mr. Patterson and argues that it proves Ellipso's
> knowledge of Mr. Patterson's dual roles prior to the actions that
> allegedly affirmed the loan agreement.  (See Email from Castiel to
> Patterson (Nov. 16, 2004), Ex. 21 to Mot. For Summ.J.)  In this email,
> Mr. Castiel states:  'In particular I never knew until May/June 2004
> that you were the 50% owner of Mann Tech and you had a stake in the
> upside of the [ICOHA] stock." (id.)  The Court finds that the only
> reasonable interpretation of this statement, unlike the content of the
> October 20, 2004 email, is that Ellipso had knowledge of Mr.
> Patterson's stake in Mann Tech no later than June 2004. "
> Memorandum Opinion, April 1, 2008

*137.*  The Court then found that Ellipso had ratified the MannTech agreement on

August 2, 2004.  It is clear that D.Castiel/Ellipso misrepresented the truth to both the

District and Appellate courts.

*138.*  Castiel also failed to produce any of the incriminating emails, despite his

testimony that he never deleted any emails from his computer.  Despite repeated court

orders, D.Castiel/Ellipso never produced either his laptop computer or C. Castiel's

computer, upon which D.Castiel testified all records of the enterprise reside.

139.  In the course of the "bad faith" law suit, D.Castiel, Ellipso, Awkard, Goodman,

Guberman, Ludaway, L&L, and Lourie obtained the confidential financial statements of

MannTech from UBS Financial Services.  On information and belief, these confidential

records were obtained by deception and fraud.  These confidential financial records have

never been returned to MannTech.

**THE UNTIED STATES DISTRICT COURT FINDS THAT D.CASTIEL AND ELLIPSO PROSECUTED THE LAW SUIT AGAINST JOHN MANN, ROBERT PATTERSON, AND MANN TECHNOLOGLIES, LLC, IN BAD FAITH:**

140.  On January 29, 2009, the United States District Court issued an Opinion and

Order addressing the question of bad faith:

> a.  The central allegation that gave rise to the plaintiff's claims was that Castiel did not know of Patterson's dual role while negotiating and reaffirming the loan agreement. Ellipso repeatedly made this allegation in pleadings and during discovery. However, as a result of an e-mail that was produced well into the litigation, the Court learned that this allegation was untrue. Ellipso did know of Patterson's role in Mann Tech in June 2004 at the latest, yet still ratified the loan agreement. In other words, the key "fact" that Ellipso used to instigate this litigation was patently false. Ellipso repeatedly made this false allegation and it was the critical fact upon which the litigation turned; this leads the Court to conclude that Ellipso intentionally made this false allegation.

> b.  Ellipso argues that even if Castiel did know of Patterson's interest in Mann Tech in June of 2004, there is no evidence that he knew of Patterson's interest from January to June of 2004. Therefore, Ellipso argues, Castiel did not know of Patterson's interest when the original loan agreement was executed and was not operating in bad faith by filing a lawsuit. (Def.'s Opp'n at 4–5.) Indeed, with respect to the claims that survived summary judgment, the Court originally agreed with the plaintiff. "[W]here a party to an executed contract discovers a material misrepresentation made in the execution of a contract, that party may elect one of two mutually exclusive remedies. He may either affirm the contract and sue for damages, or repudiate the contract and recover that

with which he or she has parted." *Ellipso*, *Inc. v. Mann,* 480 F.3d 1153, 1158 (D.C. Cir. 2007).

c.   Accordingly, it appeared that some of Ellipso's claims may have had merit even though it ratified the contract after it learned of Patterson's dual-role. After conducting the seven day jury trial, however, it became apparent that when Mann Tech foreclosed on the collateral the shares were worth considerably less than the $100,000 that Ellipso obtained from the loan. Accordingly, Ellipso suffered no provable damages and appears to have pursued the lawsuit merely to harass Mann Tech.

d.   Regardless, Ellipso's argument is a red herring. It fails to explain its conduct with regard to the claims that did not survive summary judgment, in which Ellipso stated that it was entitled to a rescission of the contract because it was unaware of Patterson's interest in Mann Tech prior to August of 2004. After examining the November 16, 2004 e-mail from Castiel, the Court determined that Ellipso's prior submissions about when Castiel possessed the relevant knowledge of Patterson's role in Mann Tech was false. In other words, Castiel misrepresented the critical fact upon which the litigation turned. This misrepresentation alone constitutes bad faith. *See Scott-Blanton v. Universal City Studios Productions LLLP*, No. 07-0098, 2009 WL 97254 at *3 (D.D.C. January 15, 2009) (Urbina, J.) (stating that attorneys' fees can be awarded when a plaintiff persists in pursuing a claim that it knows from the outset is false and wastes counsel and the court's resources). This false and misleading argument not only occurred in discovery, but also before this court and in the Court of Appeals. (Opinion and Order, January 29, 2009)

*141.*  The United States District Court then awarded sanctions in excess of two hundred thousand dollars ($200,000.00) in attorneys' fees and costs to MannTech and John Mann. A subsequent sanctions award of attorneys' fees and costs has increased that judgment to more than two hundred twenty thousand dollars ($220,000.00).

### ENFORCEMENT OF THE DISTRICT COURT JUDGMENT:

*142.*  Upon entry of the sanctions judgment by the United States District Court, MannTech sought, and obtained Writs of Attachment directed to various financial institutions which MannTech believed might be holding assets of Ellipso.  One of the

institutions to which a Writ of Attachment was issued was T.D.Ameritrade ("T.D.Am."). [A copy of the Writ of Attachment to T.D.Am. is attached as Exhibit 9, and is incorporated by reference as if fully set forth herein.]

*143.* When MannTech's process server attempted to serve the Writ of Attachment on T.D.Am. at its District of Columbia Office at Fourteenth and Eye Streets, N.W., on February 24, 2009, he was told by Mr. Bo Belinsky, T.D.Am.'s office manager, that T.D.Am. would not accept service of process in the District of Columbia, but that the Writ of Attachment would have to be served at corporate headquarters in Omaha, Nebraska. As a consequence, the Writ of Attachment was not served on T.D.Am and D.Castiel removed approximately one hundred sixty thousand dollars ($160,000.00) in assets from Ellipso's T.D.Am account the next day.

*144.* T.D.Am has a registered agent in the District of Columbia, as required by law, who is located on Vermont Avenue, N.W., only a few blocks from the T.D.Am. office. Mr. Belinsky's knowing and deliberate misdirection of the MannTech process server enabled D.Castiel to abscond with the $160,000.00, which he has now converted to his personal uses.

*145.* The other Writs of Attachment yielded only inconsequential returns.

**ELLIPSO'S FRAUDULENT BANKRUPTCY PETITION:**

*146.* Upon learning of MannTech's Writs of Attachment, D.Castiel, with the concurrence of Richard Burt, ("Burt"), currently the only other member of Ellipso's Board of Directors, caused Ellipso to file for Chapter 11 protection in the United States Bankruptcy Court for the District of Columbia, *In re: Ellipso (Debtor), No. 09-0148.* The

Petition listed in excess of thirty five million dollars ($35,000,000.00) in debts and assets of less than fifty thousand dollars ($50,000.00).

*147.* Prior to the filing of the Ellipso Bankruptcy Petition on February 25, 2009, Plaintiffs had pursued their claims for breach of contract, fraud, etc., with the expectation that they would be made whole from the assets of Ellipso and its affiliated companies. With the filing of the bankruptcy petition, and the theft of assets it revealed, it became obvious that this was much more than a simple fraud case.  The "bust out" scheme that the bankruptcy filing revealed, appeared to be simply a continuation of a pattern and practice of the Defendants to engage in criminal behavior to obtain moneys, goods, and services, and then to steal these assets for their personal enjoyment.  This is a well recognized racketeering tactic.  At this point the Plaintiffs recognized that, if they were to recover for the injuries they had suffered, they had to pursue the racketeering enterprise(es), and its/their perpetrators.

*148.* The Bankruptcy Petition and attendant Schedules contained numerous fraudulent statements such as including more than five million dollars ($5,000,000.00) in false insider claims for D.Castiel, Helman, Bailey, Awkard, and Burt.  Debtor, Ellipso, has never objected to these claims despite Debtor having issued D.Castiel's 1099 for 2007 showing payments of $397,912 and D.Castiel filing a Proof of Claim with the bankruptcy court stating he only received $65,500 in that year. The schedules also contain several million dollars in fraudulent claims for Ellipo's legal counsels, to which  Debtor, Ellipso, has never objected.  Debtor's Statement of Financial Affairs fraudulently misrepresents the financial transactions between Debtor and various insiders including the Castiels, Awkard, Lourie, and Debtor's bankruptcy counsel.  The Petition fails to list at least three

creditors, including American Express.   Debtor's bankruptcy counsel, BLTP, Patton, Rosenberg, and Goldfarb have been complicit in these fraudulent bankruptcy filings.

*149.* Since the filing of the Ellipso Bankruptcy Petition on February 25, 2009, numerous other false pleadings and schedules have been filed in that proceeding, including five false Disclosure Statements of Financial Transactions between Debtor's counsel, Butzel, Long, Tighe, Patton ("BLTP") and Debtor.   The bad faith of those filings and schedules is demonstrated in the objections to those Disclosure Statements and by comparison with Debtor's most recent tax returns which Debtor's counsel was negligent in ignoring when undertaking its supposed review of Debtor's financial affairs.

*150.* On June 26, 2009, Debtor, through counsel, BLTP, filed a fraudulent Disclosure Statement and Plan of Reorganization on behalf of Ellipso and D.Castiel, falsely stating that Debtor had six hundred thousand dollars ($600,000.00) in hand to invest in Debtor's reorganization.   Subsequently, on August 2, 2009, Debtor's counsel, Kermit Rosenberg, ("Rosenberg"), admitted that this representation was false.   Rosenberg, BLTP, D.Castiel, and Debtor made this false statement to obtain a sixty (60) day extension of the exclusivity period and thereby prevent others from presenting a plan of reorganization for the Debtor, in an effort to promote the "bust out" scheme.

*151.* Rosenberg and thereby BLTP have voluntarily and willingly joined the racketeering enterprise of Castiels/Ellipso/MCHI/etc.   At the Section 341 Hearing, Rosenberg shouted at Patterson, "You, Mr. Patterson, will never receive a single document from Debtor."   Rosenberg has made good on that promise, not producing a single document of Debtor for more than eight months, thus concealing the operations of the enterprise from the Creditors in the bankruptcy.

*152.* The Castiels have admitted to removing more than two million dollars ($2,000,000.00) from the enterprise before dumping Ellipso into bankruptcy. On information and belief, the amount stolen by the Castiels exceeds three million dollars ($3,000,000.00). Furthermore, Castiel's false statements to the bankruptcy court are criminal activity which, under any reasonable employment contract, would be grounds for instant dismissal. The Castiels, however, know that they needed to maintain control over the enterprise to continue covering up and concealing the evidence against them.

*153.* Despite the overwhelming proof that the Ellipso bankruptcy is a "bust out" scheme, and equally undeniable proof of the malfeasance of the Castiels, Debtor's counsel, BLTP, have refused to take any action to either stop the malfeasance, or to recoup the moneys taken. Since February 25, 2009, the petition date, the Castiels have removed in excess of fifty thousand dollars ($50,000.00) from the Bankruptcy Estate which they have converted to their personal enjoyment. These moneys were removed with the knowledge and assent of Rosenberg, Goldfarb, Patton, and BLTP.

*154.* Just prior to the bankruptcy filing, Ellipso had approximately one hundred sixty thousand dollars ($160,000.00) in liquid and semi liquid assets (cash and stocks) in its T.D.Ameritrade account. BLTP made a deal with D.Castiel to take sixty thousand dollars ($60,000.00) of these liquid assets to file Ellipso's bankruptcy. By this tactic, BLTP secured for itself more than one third of all of the liquid assets of Ellipso, to the detriment of the other Creditors, and became a willing participant in the "bust out" scheme.

**THE FRAUDULENT LAW SUIT AGAINST ICO GLOBAL:**

*155.* As previously described, the enterprise had entered into an agreement to sell ICO Global shares of ESBH belonging to MCHI, in return for cash and stock in ICO Global.

*156.* On December 5. 2006, the enterprise filed suit against ICO Global in the Superior Court for the District of Columbia, *Ellipso, Inc. v. ICO Global Communications Holdings, LTD, Civ. No. 06-0008684 )*

*157.* In the Complaint in that action, Ellipso makes numerous fraudulent assertions, including, but not limited to:

¶ 52 – that neither D.Castiel nor anyone else at the enterprise made any inquiry concerning the value of the ICO Global stock the enterprise had received prior to May 2004;

¶ 56 – that prior to May 2004, D.Castiel and everyone at the enterprise believed in 2004 that the ICO Global stock held by MCHI was worth more than $11.00 per share;

¶57 – that in May 2004 D.Castiel first inquired about the sale of the ICO Global shares and their value;

¶ 58 – that in May 2004 D.Castiel was **shocked** to learn that the value of the ICO Global stock was less than a dollar a share.

*158.* Each of these factual assertions is false.  As set forth above, in December 2003, D.Castiel entered into the stock margin loan agreement with MannTech, in which the parties agree that the strike price for the stock is fifty-five cents ($0.55) per share. D.Castiel had approached Mann about purchasing some of the ICO Global shares for fifty cents ($0.50) per share in November 2003. D.Castiel and the enterprise were never deceived about the value of the ICO Global stock which MCHI received.

*159.* The institution of the suit by Ellipso and Ellipso Private Holdings over the failure of ICO Global to complete the Second Closing is yet another example of the theft of MCHI's assets.  MCHI was the entity which owned ESBH (and still does).  It was MCHI who was paid for the assets of ESBH, not Ellipso or Ellipso Private Holdings.  It is MCHI who had the claim against ICO Global.

*160.* This fraudulent law suit was settled by ICO Global in June 2008 for five hundred thousand dollars cash ($500,000.00) and seven hundred fifty thousand (750,000) additional shares of ICO Global stock. The total value of the settlement approached three million dollars ($3,000,000.00). MCHI received none of these proceeds, diverted to avoid payment to creditors of MCHI including the judgment against MCHI obtained by former employee Capt. John Draim. All the proceeds net of legal fees went directly to Ellipso. On information and belief, BLTP was aware of and complicit in these acts, receiving a portion of the diverted proceeds.

*161.* D.Castiel promptly took all the available cash from the settlement and applied it to Ellipso's obligations, including almost three hundred thousand dollars ($300,000.00) for himself and C.Castiel. All of the 750,000 shares of ICO Global stock have also been liquidated (all but 160,000 shares prior to the bankruptcy filing), with the Castiels taking eighty percent (80%) of the proceeds. After the bankruptcy filing the Castiels took another eighty percent (80%) from the liquidation of the remaining 160,000 shares.

**THE RACKETEERING ENTERPRISE IS ON GOING:**

*162.* The Castiels, David and Cameran, are continuing their pattern and practice of refusing to pay their lawful debts, and then resorting to illicit litigation to extort their creditors into waiving their legal rights. Two recent cases, one involving moneys due to a painting contractor and one for fees owed to an educational consultant, illustrate this ongoing scheme, *See, [cite to Super Ct. cases,]*

*163.* On the business front, the enterprise continues to employ litigation, and the threat of litigation, to intimidate its creditors into waiving their legal rights. Recently the law firm of Lerman, Senter sought to collect more than three million dollars ($3,000,000.00)

for legal services provided to VirtualGeo and MCHI. The enterprise, represented by D.Castiel and Attorney Awkard, threatened to sue Lerman, Senter for various claims, including breach of contract, legal malpractice, and breach of fiduciary duty, as well as file complaints against the lawyers with the Ethics Office of the District of Columbia Bar Association. This matter remains unresolved.

*164.* On information and belief, this pattern and practice of threatening attorneys with ethics complaints to the bar, and law suits for legal malpractice, breach of fiduciary duty, and other "kitchen sink" allegations, is a staple of the enterprises' operations. On information and belief, this extortionist tactic has been employed by the enterprise against more than twenty law firms entailing fees exceeding five million dollars ($5,000,000.00). Most of the recent victims are Creditors in the Ellipso bankruptcy, *In re: Ellipso (Debtor), Id.,* where the "bust out" scheme will pay them, at most, less than three cents on the dollar (<$0.03 / $1.00).

*165.* The law firms who have been victims of this extortion include, but are not limited to, Baker, Botts, LLP; Morris, Nichols, LLP; Bryan, Cave, LLP; David Dort, Esq.; Lerman, Senter, LLP; and Akin, Gump, LLP.

*166.* In an attempt to intimidate Patterson, D.Castiel and C.Castiel, recently falsely accused Patterson of stalking them, *Castiel v. Patterson, Civil Action No. 4941-09. Superior Court for the District of Columbia.*

*167.* After the Castiels' Motion for Injunctive Relief was denied—the court found, "the plaintiff is unlikely to be able to succeed on the merits"--the case was dismissed for lack of prosecution.

*168.*  As noted, *supra.,* Captain John Draim has been in litigation with the enterprise, VirtualGeo and MCHI, for a decade; having finally obtained a judgment for payments for his personal services provided to the enterprise in the 1990s for developing the elliptical satellite technology.  When Capt. Draim sought to collect on his judgment, D.Castiel and MCHI filed a fraudulent Response to the Asset Interrogatories in which it is falsely stated that MCHI has no assets. Capt. Draim is still seeking to collect on his judgment.

*169.*  The Castiels continue to control the enterprise through their control of Ellipso Private Holdings, VGHI, Ellipso (Debtor), MCHI, VirtualGeo, AirStellar, and ESBH. The Castiels continue to retain the proceeds from the racketeering operations of the enterprise, and to employ those racketeering proceeds to further the goals and objectives of the enterprise – which includes avoiding payment of legal debts through extortion and "bust out" schemes.

*170.*  In the bankruptcy proceeding, *In re: Ellipso (Debtor),* D.Castiel, through Debtor's counsels, Rosenberg, Goldfarb, Patton, and BLTP, is seeking to retain ownership and control of Debtor Ellipso, while at the same time stripping Ellipso of all debts.  This is a continuance of the pattern and practice of "bust out" schemes employed by the enterprise as standard operating procedure.  "The music plays on."

**THE RACKETEERING ENTERPRISES**

*171.*  The factual situation substantiating this Complaint exceeds a decade and involves scores of Defendants, accomplices, victims, and innocent parties whose incidental participation was unintended, e.g. UBS Financial Services, Inc., and the brokerages which handled the fraudulent stock transactions as well as the banks which processed the proceeds of the racketeering enterprises.   Due to the complexity and scope of the

racketeering enterprises, as well as the opaqueness of the various associations within the enterprises, several alternative enterprises are pled, so as to meet the strictures of the R.I.C.O. statute. These are presented as Enterprise Alternatives I through VIII; although other alternative enterprises are certainly possible. Should discovery, and or trial, produce evidence of these other alternative enterprises, Plaintiffs will seek leave to amend this Complaint to conform to the proof adduced.

**ENTERPRISE ALTERNATIVE I –ASSOCIATION(S)-IN-FACT**:

*172.* Two or more of the Defendants, but not necessarily all of the Defendants, each as persons within the meaning of RICO, commencing at various times from and after 1999, and continuing to the present and beyond, formed associations-in-fact for the purpose of extorting, converting, or otherwise illegally obtaining, money, services, securities, and other things of value, from Plaintiffs and others, as set forth herein. The Defendants, and each of them, received income or other things of value from the pattern of racketeering activity set forth herein.

*173.* In furtherance of these associations-in-fact, each of the Defendants, individually and collectively, agreed and colluded to commit both the RICO offenses and the predicate acts as detailed herein; and to utilize the instruments of interstate commerce in the commission of these offenses and acts in violation of 18 U.S.C. § 1341, 1343; 1951, and 1961(1)(A), and in violation of other federal statutes, as well as the laws of the District of Columbia and the Commonwealth of Virginia, all as set forth herein. These uses of the United States Mail Service, interstate wire services, acts of extortion, obstruction of justice, and violations of state criminal statutes, by each of the

associations-in-fact constitutes "a pattern of racketeering activity" as defined in 18 U.S.C. § 1961(1), (5).

174. The activities of these associations-in-fact affect interstate and foreign commerce in that the Plaintiffs, the Defendants, and the other victims involved are each engaged in interstate commerce.

175. On the information that is currently available to Plaintiffs, the following associations-in-fact appear to have been formed:

1.   The over-all association-in-fact formed by two or more, but not necessarily all of the Defendants, and Perhaps others, commencing on or about 1999 and continuing;

2.   The association-in-fact formed on or about 1999 and continuing until apprroximately 2005, directed at defrauding the investor who invested $9,500,000.00 into VirtualGeo and MCHI whose members include, two or more, but are not limited to, VirtualGeo, MCHI, Ellipso, Ellipso, VGHI, Private Holdings, AirStellar, David Castiel, Cameron Castiel, Helman, Bailey, Burt, Taylor, Awkard, and others unknown at this time;

3.   The association-in-fact directed at concealing MCHI's assets from its creditors in the May 2003 bankruptcy proceeding, whose members include two, but not necessarily all, D.Castiel, C.Castiel, MCHI, VGHI, Ellipso, Ellipso Private Holdings, AirStellar, VirtualGeo, ESBH, Burt, Taylor, Bailey, and others unknown at this time;

4.   The association-in-fact formed in or about 2003 for the purpose of converting MCHI's assets (its ICO Global stock), whose members include two, but not necessarily all, D.Castiel, C.Castiel, Helman, Burt, Taylor, Awkard, Ellipso, Ellipso Private Holdings, Air Stellar, Bailey, VGHI, and others unknown at this time;

5.   The association-in-fact formed on or about 2002 and continuing, for the purpose of avoiding payment of back salaries, benefits, and bonuses to Ellipso employees, including Capt. John Draim, whose members include two, but not necessarily all, Bailey, Awkard, D.Castiel, C.Castiel, BLTP, Patton, David Dort, Esq., Taylor, Burt, Ellipso, MCHI, AirStellar, Ellipso Private Holdings, VirtualGeo, VGHI, and others unknown at this time;

6.   The association-in-fact formed in or about November 2003 and ongoing directed at defrauding Plaintiffs, whose members include two, but not

necessarily all, D.Castiel,C.Castiel, Tomissoni, Helman, Bailey, Burt, Taylor, Ellipso, MCHI, VirtualGeo, ESBH, AirStellar, Awkard, Lourie, Gubberman, Ludaway,  Goodman, L&L, Patton, Rosenberg, Goldfarb, BLTP, T.D.Am., Belinsky, VGHI, and others unknown at this time;

7.   The association-in-fact formed in 2006 and ongoing, for the purpose of filing a fraudulent law suit against ICO Global in the Superior Court for the District of Columbia, whose members include two, but not necessarily all D.Castiel, C.Castiel, Ellipso, MCHI, VGHI, Ellipso Private Holdings, Awkard, Burt, Taylor, Bailey, and others unknown at this time.

8.   These associations-in-fact formed an association-in-fact, or associations-in-fact, formed and ongoing for the purpose of effectuating the illicit and illegal racketeering activities set forth herein.

## ENTERPRISE ALTERNATIVE II – THE CASTIEL FAMILY:

*176.* The Castiel Family is a family unit consisting of David Castiel and Cameran Castiel, husband and wife, and other family members and close friends whose identity and involvement in the racketeering activities are unknown at this time; although on information and belief, many of these other "family and friends" have invested in Ellipso Private Holdings and have received, or stand to receive, financial benefits from the racketeering activities of the Castiel Family.  The Castiel Family has been, and continues to be, involved in every aspect of the racketeering activities substantiating this Complaint.

*177.* The Castiel Family constitutes an enterprise within the meaning of 18 U.S.C. § 1961 *et seq.,* which is engaged in, or the activities of which affect, interstate or foreign commerce, in that its members reside in different states and it conducts its business across state lines, including the boundaries of the District of Columbia, utilizing the interstate mails, wire, and transportation systems.

## ENTERPRISE ALTERNATIVE III – ELLIPSO PRIVATE HOLDINGS:

*178.* Ellipso Private Holdings, Inc., ("Holdings"), is a Delaware corporation with its principal offices in the District of Columbia.  The owners of Holdings are the Castiel Family.  The officers and directors of Holdings are the David Castiel and other members of the Castiel Family.  Holdings holds two thirds (2/3s) of the stock of Ellipso.  Holdings has been involved in every aspect of the racketeering activities substantiating this Complaint.

*179.* Holdings constitutes an enterprise within the meaning of 18 U.S.C. § 1961 *et seq.,* which is engaged in, or the activities of which affect, interstate or foreign commerce, in that it conducts its business across state lines, including the boundaries of the District of Columbia, utilizing the interstate mails, wire, and transportation systems.

## ENTERPRISE ALTERNATIVE IV – VIRTUAL GEO HOLDINGS, LLC:

*180.* Virtual Geo Holdings, LLC, ("VGHI"), is a Delaware corporation with its principal offices in the District of Columbia.  The owners of VGHI are the Castiel Family.  The Managing Members of VGHI are David Castiel and other members of the Castiel Family.  VGHI holds approximately ten percent (10%) of the stock of Ellipso. VGHI has been involved in every aspect of the racketeering activities substantiating this Complaint.

*181.* VGHI constitutes an enterprise within the meaning of 18 U.S.C. § 1961 *et seq.,* which is engaged in, or the activities of which affect, interstate or foreign commerce, in that it conducts its business across state lines, including the boundaries of the District of Columbia, utilizing the interstate mails, wire, and transportation systems.

## ENTERPRISE ALTERNATIVE V – MCHI:

*182.* Mobile Communications Holdings, Inc., ("MCHI") is a Delaware corporation with its principal offices in the District of Columbia.  MCHI is owned 80% by AirStellar and 20% by Ellipso. MCHI was the original business entity, formed in 1991, and thus the forerunner of the other corporate entities.  MCHI has been involved in every aspect of the racketeering activities substantiating this Complaint either as perpetrator, participant, or victim.

*183.* MCHI constitutes an enterprise within the meaning of 18 U.S.C. § 1961 *et seq.,* which is engaged in, or the activities of which affect, interstate or foreign commerce, in that it conducts its business across state lines, including the boundaries of the District of Columbia, utilizing the interstate mails, wire, and transportation systems.

## ENTERPRISE ALTERNATIVE VI – ELLIPSO:

*184.* Ellipso, Inc., ("Ellipso") is a Delaware corporation with its principal offices in the District of Columbia.   Controlling interest in Ellipso is held by Holdings, VGHI, and the Castiels.  Ellipso holds 20% of the stock of MCHI, and 100% of the stock of AirStellar, which in turn holds the other 80% of the stock of MCHI.

*185.* Ellipso constitutes an enterprise within the meaning of 18 U.S.C. § 1961 *et seq.,* which is engaged in, or the activities of which affect, interstate or foreign commerce, in that it conducts its business across state lines, including the boundaries of the District of Columbia, utilizing the interstate mails, wire, and transportation systems.

## ENTERPRISE ALTERNATIVE VII – THE VICTIMS:

*186.* The Plaintiffs, and the other victims, of the racketeering activities set forth herein, are each legitimate businesses which conduct their businesses across state lines, and thus are engaged in, or their activities affect, interstate or foreign commerce.  As such, each

constitutes an enterprise within the meaning of 18 U.S.C. § 1961 *et seq.* The victims, individually and/or collectively, have been involved in every racketeering activity set forth in this Complaint.

*187.* As more fully set forth herein, the victims, including specifically the Plaintiffs have suffered injury to their business and/or property as a consequence of the racketeering activities of Defendants. The predicate acts and illegal acts of Defendants proximately caused Plaintiffs' injuries as set forth herein.

**ENTERPRISE ALTERNATIVE VIII – UBS FINANCIAL SERVICES:**

*188.* UBS Financial Services, ("UBS"), is a legitimate businesses which conducts its business across state lines, and thus it is engaged in, or its activities affect, interstate or foreign commerce. As such, UBS constitutes an enterprise within the meaning of 18 U.S.C. § 1961 *et seq.* UBS has been involved in the racketeering activity set forth in this Complaint in that it has been the instrument utilized to transfer securities and money which represent the assets and proceeds of the racketeering activities detailed in this Complaint.

*189.* The Defendants, individually and collectively, have employed the artifices of fraud, conversion, conspiracy, extortion, and racketeering to wrongfully obtain money, property, securities, and other things of value, within the custody and control of UBS in furtherance of their illicit activities, in violation of 18 U.S.C. § 1341, 1343; 1951, and 1961(1)(A), as well as the state criminal statutes set forth below.

**THE PATTERN AND PRACTICE OF RACKETEERING**
**and**
**THE RACKETEERING CONSPIRACY**

*190.* As specified herein, the Defendants' actions which constitute the racketeering activities have been on going, and continuous, since at least 1999. The discernable pattern is to employ the artifices of fraud, mail fraud, wire fraud, material misrepresentations, extortion, concealment of material information, money laundering, travel act violations, false written and oral statements and promises, threats, intimidation, perjury, obstruction of justice, slander, liable, defamation, falsifying evidence, destruction of evidence, concealment of evidence, filing false pleadings, bankruptcy fraud, conversion, diversion of revenues, bank fraud, Hobbs Act violations, conspiracy, suborning perjury, income tax evasion, income tax fraud, evasion of lawful service of process, bribery, larceny, malicious prosecution, abuse of process, theft, receipt of illicit revenues from gambling and pornography, unfair trade practices, violation of the Foreign Corrupt Practices Act, and other violations and criminal acts to obtain moneys, services, and other things of value, for the benefit of the criminal enterprise(s) and the Defendants, individually and collectively.

*191.* Each Defendant, as more fully set forth herein, did agree, consent, collude, conspire, conceal, commit, assent to, assist in, aide and/or abet, facilitate - the commission of at least two of the prohibited acts proscribed by 18 U.S.C. 1961 *et seq.* Each Defendant affirmatively joined in the racketeering conspiracy with the intent to violate, and for the purpose of objectively violating, the RICO statute, as specified herein.

*192.* Each of the Defendants did conduct, manage, operate, or participate, directly or indirectly, in the conduct of the affairs of the enterprise(s) in violation of 18 U.S.C. § 1962(c), as more fully specified herein.

*193.* Each Defendant is a person as defined in the RICO Act, and each Defendant received financial or other things of value from his/her participation in the racketeering activities as specified herein.

*194.* The Defendants, individually and/or collectively, did directly, or indirectly, invest in, or maintain an interest in, or participate in, the racketeering enterprise(s), all as set forth herein.

*195.* The actions and activities of the Defendants, as set forth herein, constitute a pattern and practice of racketeering activity as defined in 18 U.S.C. 1961, and 1962, *et seq.*

**THE PREDICATE ACTS**
**and**
**THE PROXIMATE INJURIES TO PLAINTIFFS**

*196.* As specified herein, the Defendants, individually and collectively, committed literally thousands of criminal acts of extortion, fraud, wire fraud, mail fraud, bank fraud, material misrepresentations, concealment of material information,  false written and oral statements and promises, threats, intimidation, perjury, obstruction of justice, slander, liable, defamation, falsifying evidence, destruction of evidence, concealment of evidence, filing false pleadings, bankruptcy fraud, conversion, diversion of revenues, bank fraud, Hobbs Act violations, conspiracy, suborning perjury, income tax evasion, income tax fraud, evasion of lawful service of process, bribery, larceny, money laundering, travel act violations, malicious prosecution, abuse of process, theft, receipt of illicit revenues from gambling and pornography, unfair trade practices, violation of the Foreign Corrupt Practices Act, and other violations and criminal acts to obtain moneys, services, and other things of value, for the benefit of the criminal enterprise(s) and the Defendants,

individually and collectively.  These constitute predicate acts as defined under 18 U.S.C. 1961, and 1962, *et seq.*

197.  The specific acts and/or activities of each Defendant are enumerated below.

198.  As specified herein, the predicate acts proximately caused injury to Plaintiffs' business and/or property, individually and collectively.  The specific injuries proximately caused by the specific predicate acts of each Defendant are described below.


**SPECIFIC ALLEGATIONS AND COUNTS AGAINST EACH DEFENDANT**


**ELLIPSO, INC. (DEBTOR), ("Ellipso" or "Debtor"):**

**Ellipso – Count I:  Violation of 18 U.S.C. § 1962(a).**

199.  As set forth herein Ellipso engaged in a pattern of racketeering from which Ellipso obtained income.  This illegal income was derived at least in part from the following:

  1.    The misappropriation of $9,500,000.00 invested in VirtualGeo and Ellipso in 2001;

  2.    The conversion of 1,571,547 shares of ICOG stock which was the property of MCHI between 2004 and 2007;

  3.    The conversion of approximately $3,000,000 in cash and stock due MCHI in lieu of its Second Closing with ICO Global in 2008.

  4.    Income derived from the filing of false state and federal income tax returns in 2004, 2005, 2006 and 2007;

  5.    Income derived from the filing of the fraudulent MCHI Bankruptcy Petition in 2003;

  6.    Income derived from fraudulently concealing assets from creditor Capt. John Draim;

7.     Income derived from the filing and prosecution of fraudulent law suits against employees of Ellipso, including, but not limited to, Richard Knowlton, Richard Inciardi, John Naughton, and Capt. John Draim;

8.     Moneys derived from the fraudulent loan transaction with MannTech in 2004 and on going;

9.     Income derived from the gambling and pornography telephone services in 2004 to 2007;

10.     Income from the royalty payments from TRSC which were procured by fraud in 2004;

11.     Income derived from the concealment and theft of the 881 telephone revenues from TRSC in 2004 to 2007 and continuing;

12.     Income derived from the intentional interference with TRSC's business plans and the MCI/Verizon Contract in 2006 and continuing;

13.     Moneys retained due to the filing of the "bust out" bankruptcy petition in 2009, and continuing.

200.     Ellipso used or invested, directly or indirectly, part or all of such income, or the proceeds of such income, in the establishment or operation of the Enterprise(s) Alternatives I through VIII, to further the Enterprise(s)' racketeering schemes to defraud and otherwise illicitly obtain moneys, properties, and business advantages belonging to Plaintiffs.

201.     As part of the operation of Ellipso's business, these proceeds of the racketeering activities were employed to prosecute fraudulent law suits, including the arbitration proceeding with TRSC, the "bad faith" District Court Case (*Ellipso v. Mann, Id.),* and the fraudulent "bust out" bankruptcy proceeding, *In re: Ellipso (Debtor), Id.* These proceeds of the racketeering activities were used for the payment of attorneys' fees and costs for these law suits.

*202.* As a direct consequence of the application of these proceeds from the racketeering activities to prosecute these illicit legal proceedings, Plaintiffs suffered injury to their businesses and property in the form of attorneys' fees, costs, lost employee time, lost business, damage to business reputation(s), lost business opportunities, lost revenues, and other damages as set forth herein, in the amount of ten million dollars ($10,000,000.00) or such other amount as may be proved at trial.

**ELLIPSO – COUNT II:  Violation of 18 U.S.C. 1962(b).**

*203.* The allegations in Count I. are incorporated by reference as if fully set forth herein.

*204.* Ellipso utilized these proceeds from the racketeering activities to acquire an interest in and maintain control of businesses engaged in, or whose activities affected, interstate commerce, including MCHI, VirtualGeo, and ESBH.

*205.* Ellipso utilized these proceeds from the racketeering activities to acquire an interest in and maintain control of other unrelated businesses engaged in, or whose activities affected intestate commerce, including Butzel, Long, Tighe, Patton, PLLP, Leftkowitz & Ludaway, PLLP, Linda Awkard and Associates, Chartered, and Vanessa Carpenter Lourie, PLLP

*206.* Ellipso utlilzed these proceeds from the racketeering activities to acquire an interest in and maintain control of other unrelated businesses engaged in, or whose activities affected intestate commerce, including UBS Financial Services, Sun Trust, and T.D.Ameritrade, as well as Plaintiffs.

*207.* As a direct consequence of the application of these proceeds from the racketeering activities to acquire interests in and control over these interstate businesses,

which were then employed to prosecute illicit legal proceedings against Plaintiffs, and to transfer moneys and other things of value; Plaintiffs suffered injury to their businesses and property in the form of attorneys' fees, costs, lost employee time, lost business, damage to business reputation(s), lost business opportunities, lost revenues, and other damages as set forth herein, in the amount of ten million dollars ($10,000,000.00) or such other amount as may be proved at trial.

**ELLIPSO – COUNT III:  Violation of 18 U.S.C. 1962(c).**

*208.*  Ellipso is a person within the definition of 18 U.S.C. 1961, which has been, and is, associated with the Enterprise(s) Alternatives I through VIII.

*209.*  Ellipso has conducted and/or participated, directly and/or indirectly, in the conduct of such Enterprise(s)' affairs through a pattern of racketeering activity, which has included the artifices of fraud, mail fraud, wire fraud, material misrepresentations, extortion, concealment of material information, money laundering, travel act violations, false written and oral statements and promises, threats, intimidation, perjury, obstruction of justice, slander, liable, defamation, falsifying evidence, destruction of evidence, concealment of evidence, filing false pleadings, bankruptcy fraud, conversion, diversion of revenues, bank fraud, Hobbs Act violations, conspiracy, suborning perjury, income tax evasion, income tax fraud, evasion of lawful service of process, bribery, larceny, malicious prosecution, abuse of process, theft, receipt of illicit revenues from gambling and pornography, unfair trade practices, violation of the Foreign Corrupt Practices Act, and other violations and criminal acts, all as set forth herein.

*210.*  These activities constitute racketeering activities as the term is defined in 18 U.S.C. § 1961, in that they involve, "… gambling ….  robbery, bribery, extortion, dealing

in obscene matter which are chargeable under state law and punishable by imprisonment for more than one year; … and/or indictable under Title 18, United States Code Sections 1084 (transmission of gambling information), 1341 (mail fraud), 1343 (wire fraud), 1344 (financial institution fraud), 1461-1465 (obscene matter), 1503 (obstruction of justice), 1512 (tampering with a witness, victim, or an informant), 1951 (interference with commerce, robbery, or extortion), 1952 (racketeering), 1955 (the prohibition of illegal gambling businesses), 1956 (the laundering of monetary instruments), 1957 (engaging in monetary transactions in property derived from specified unlawful activity) , 2314 and 2315 (interstate transportation of stolen property);" or are indictable as "any offense involving fraud connected with a case under title 11 …or fraud in the sale of securities … punishable under any law of the United States." 18 U.S.C. § 1961.

*211.* The specific acts committed by Ellipso which are applicable to each offense are as follows:

*212.* Sections 1084 (transmission of gambling information), Provides,

> Whoever being engaged in the business of betting or wagering knowingly uses a wire communication facility for the transmission in interstate or foreign commerce of bets or wagers or information assisting in the placing of bets or wagers on any sporting event or contest, or for the transmission of a wire communication which entitles the recipient to receive money or credit as a result of bets or wagers, or for information assisting in the placing of bets or wagers, shall be fined under this title or imprisoned not more than two years, or both

> Section 1955 (the prohibition of illegal gambling businesses): Provides,

> **(a)** Whoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be fined under this title or imprisoned not more than five years, or both.
> **(b)** As used in this section—
> **(1)** "illegal gambling business" means a gambling business which—
> **(i)** is a violation of the law of a State or political subdivision in which it is conducted;
> **(ii)** involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and

    **(iii)** has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.

*213.* From on or about October 2004 and continuing until on or about July 2007, Ellipso, through the 881 audiotext telephone services it provided, facilitated, enabled, and transmitted gambling information, and conducted a gambling business, from which Ellipso received in excess of six hundred thousand dollars ($600,000.00) in illicit payments. These proceeds from this racketeering activity were used to operate and control Ellipso and other Enterprises, and to fund the other illicit racketeering activities including the "bad faith" law suits against Plaintiffs. Plaintiffs were proximately injured in their business(es) and property by these actions, as set forth herein.

*214.* B. Section 1341 (mail fraud): Provides,

    Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, … for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing,

*215.* As set forth herein, Ellipso has engaged in a continuous pattern of mail fraud from and after 1999. The specific offenses are detailed in the Statement of Facts and in Exhibits 4 and 5 attached hereto and are incorporated by reference as if fully set forth herein. These mail communications were false and misleading in themselves, or were an integral part of the scheme(s) to defraud the victims including Plaintiffs. Additionally, Ellipso utilized the interstate mails to transfer moneys, securities and other proceeds of its

racketeering activities, also as set forth on Exhibits 4 and 5; as well as to file and serve fraudulent pleadings effectuating Ellipso's "bad faith" law suits against Plaintiffs.   This racketeering activity proximately caused Plaintiffs' injury to their business(es) and property, as set forth herein.

216.   C. Section 1343 (wire fraud): Provides,

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice,

217.   As set forth herein, Ellipso has engaged in a continuous pattern of wire fraud from and after 1999.   The specific offenses are detailed in the Statement of Facts and in Exhibit    , attached hereto and are incorporated by reference as if fully set forth herein. These wire communications were false and misleading in themselves, or were an integral part of the scheme(s) to defraud the victims including Plaintiffs.   Additionally, Ellipso utilized the interstate wires to transfer moneys, securities and other proceeds of its racketeering activities, also as set forth on Exhibits 4 and 5; as well as to file and transmit false and fraudulent pleadings effectuating Ellipso's "bad faith" law suits against Plaintiffs.   This racketeering activity proximately caused Plaintiffs' injury to their business(es) and property, as set forth herein.

218.   D.  Section 1344 (financial institution fraud):  Provides,

> Whoever knowingly executes, or attempts to execute, a scheme or artifice—
> **(2)** to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises

*219.* As set forth herein, Ellipso has engaged in a continuous pattern of financial institution fraud from and after 1999.  The specific offenses are detailed in the Statement of Facts and in Exhibits 4 and 5 , attached hereto and incorporated by reference as if fully set forth herein.  Under Section 1344(2), Ellipso committed financial institution fraud by obtaining funds "under the custody and control of" various financial institutions including UBS Financial Services, Sun Trust and T.D.Ameritrade, to which Ellipso had no legal right. Ellipso also utilized the financial institutions, UBS Financial Services and T.D.Ameritrade, to transfer and negotiate the ICO Global stock which Ellipso obtained as proceeds of its fraudulent racketeering activities.  These acts of bank fraud were an integral part of the scheme(s) to defraud the victims including Plaintiffs. This racketeering activity proximately caused Plaintiffs' injury to their business(es) and property, as set forth herein.

*220.* E.  Sections 1461-1465 (obscene matter):  From on or about October 2004 and continuing until on or about July 2007, Ellipso, through the 881 audiotext telephone services it provided, facilitated, enabled, and transmitted obscene and pornographic "matter of indecent character" from which Ellipso received in excess of six hundred thousand dollars ($600,000.00) in illicit payments. These proceeds from this racketeering activity were used to operate and control Ellipso and other Enterprises, and to fund the other illicit racketeering activities including the "bad faith" law suits against Plaintiffs. Plaintiffs were proximately injured in their business(es) and property by these actions, as set forth herein.

*221.* F.   Section 1503 (obstruction of justice):   A person who " …corruptly … influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due

administration of justice, is guilty of obstruction of justice…" 18 U.S.C. § 1503.  As

presented in the Statement of Facts, Ellipso has attempted to impede, and has impeded

the due administration of justice by, *inter alia.,* filing "bad faith" law suits, committing

repeated acts of perjury, suborning perjury, falsifying evidence, concealing evidence,

destroying evidence, filing false and fraudulent pleadings, unreasonably and vexatiously

multiplying judicial proceedings (in violation of 28 U.S.C. § 1927), evading lawful

service of process, and witness tampering (see below).   These acts of obstruction of

justice were an integral part of the scheme(s) to defraud the victims including Plaintiffs.

This racketeering activity proximately caused Plaintiffs' injury to their business(es) and

property, as set forth herein.

*222.*  G.  Section 1512 (tampering with a witness, victim, or an informant): Provides,

> **(b)** Whoever knowingly uses intimidation, threatens, or corruptly
> persuades another person, or attempts to do so, or engages in misleading
> conduct toward another person, with intent to—
>   **(1)** influence, delay, or prevent the testimony of any person in an official
> proceeding;
>   **(2)** cause or induce any person to—
>   **(A)** withhold testimony, or withhold a record, document, or other object,
> from an official proceeding;
>   **(B)** alter, destroy, mutilate, or conceal an object with intent to impair the
> object's integrity or availability for use in an official proceeding;
>   **(C)** evade legal process summoning that person to appear as a witness,
> or to produce a record, document, or other object, in an official
> proceeding; or
>   **(D)** be absent from an official proceeding to which such person has been
> summoned by legal process; or
>   **(c)** Whoever corruptly—
>   **(1)** alters, destroys, mutilates, or conceals a record, document, or other
> object, or attempts to do so, with the intent to impair the object's integrity
> or availability for use in an official proceeding; or
>   **(2)** otherwise obstructs, influences, or impedes any official proceeding,
> or attempts to do so,
>   shall be fined under this title or imprisoned not more than 20 years, or
> both.
>   **(f)** For the purposes of this section—

(1) an official proceeding need not be pending or about to be instituted at the time of the offense; and

(2) the testimony, or the record, document, or other object need not be admissible in evidence or free of a claim of privilege.

(g) In a prosecution for an offense under this section, no state of mind need be proved with respect to the circumstance—

(k) Whoever conspires to commit any offense under this section shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy.

Ellipso tampered with witnesses in the TRSC Arbitration by suborning perjury from John Page, as set forth in the Statement of Facts. In the United States District Court case, *Ellipso v. Mann, Id*, Ellipso caused D.Castiel to present perjured testimony and fraudulent evidence. In both proceedings Ellipso introduced fraudulent documents, altered and destroyed evidence, and concealed documents. C.Castiel evaded legal process on herself and D.Castiel and Ellipso (Debtor) by secreting herself in her home and refusing to accept service. These acts of witness tampering, manipulation of evidence, and evasion of service of process, were an integral part of the scheme(s) to defraud the victims including Plaintiffs. This racketeering activity proximately caused injury to Plaintiffs' business(es) and property, as set forth herein.

*223.* H. Section 1951 (interference with commerce, robbery, or extortion): Ellipso's racketeering activities detailed herein interfered, and interferes, with interstate commerce. Ellipso committed robbery when it took the 1,571,547 shares of ICO Global stock from MCHI and converted them to its own use. As set forth herein, Ellipso has committed repeated acts of extortion which have proximately caused injury to Plaintiffs' business(es) and property. Ellipso committed a further robbery in diverting the further proceeds in the transaction between ICO Global and MCHI comprising cash and stock with a value of approximately $3,000,000 on or around May/June 2008. Ellipso

concealed and then converted the revenues from the 881 telephone services which belonged to TRSC.

*224.*    I.  Section 1952 (racketeering):   Provides,

 "**(a)** Whoever travels in interstate or foreign commerce or uses the mail or any facility in interstate or foreign commerce, with intent to—

**(1)** distribute the proceeds of any unlawful activity; or

**(2)** commit any crime of violence to further any unlawful activity; or

**(3)** otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,

and thereafter performs or attempts to perform—

**(A)** an act described in paragraph (1) or (3) shall be fined under this title, imprisoned not more than 5 years, or both;

Here, Ellipso, through its officers, directors, and agents, has traveled in interstate commerce and has used the mails and other facilities of interstate commerce, with the intent to, and to, distribute the proceeds of unlawful activities. These acts of racketeering were an integral part of the scheme(s) to defraud the victims including Plaintiffs. This racketeering activity proximately caused injury to Plaintiffs' business(es) and property, as set forth herein

*225.*    J.  Section 1956 (the laundering of monetary instruments): Provides,

 **(a)** **(1)** Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—

**(A)**

**(i)** with the intent to promote the carrying on of specified unlawful activity; or

**(ii)** with intent to engage in conduct constituting a violation of section 7201 or 7206 of the Internal Revenue Code of 1986; or

**(B)** knowing that the transaction is designed in whole or in part—

**(i)** to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or

**(ii)** to avoid a transaction reporting requirement under State or Federal law,

(**2**) Whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States—

(**A**) with the intent to promote the carrying on of specified unlawful activity; or

(**B**) knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represent the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer is designed in whole or in part—

(**i**) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or

(**3**) Whoever, with the intent—

(**A**) to promote the carrying on of specified unlawful activity;

(**B**) to conceal or disguise the nature, location, source, ownership, or control of property believed to be the proceeds of specified unlawful activity; or

(**C**) to avoid a transaction reporting requirement under State or Federal law,

conducts or attempts to conduct a financial transaction involving property represented to be the proceeds of specified unlawful activity, or property used to conduct or facilitate specified unlawful activity,

As set forth in the Statement of Facts, Ellipso has engaged in numerous and repeated acts of money laundering to effectuate its racketeering activities and to conceal these activities.  These acts of money laundering were an integral part of the scheme(s) to defraud the victims including Plaintiffs. This racketeering activity proximately caused injury to Plaintiffs' business(es) and property, as set forth herein

*226.* Section 1957 (engaging in monetary transactions in property derived from specified unlawful activity): Provides,

(**a**) Whoever, in any of the circumstances set forth in subsection (d), knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity, shall be punished as provided in subsection (b).

(**d**) The circumstances referred to in subsection (a) are—

(**1**) that the offense under this section takes place in the United States or in the special maritime and territorial jurisdiction of the United States; or

**(2)** that the offense under this section takes place outside the United States and such special jurisdiction, but the defendant is a United States person (as defined in section 3077 of this title, but excluding the class described in paragraph (2)(D) of such section).

**(f)** As used in this section—

**(1)** the term "monetary transaction" means the deposit, withdrawal, transfer, or exchange, in or affecting interstate or foreign commerce, of funds or a monetary instrument (as defined in section 1956 (c)(5) of this title) by, through, or to a financial institution (as defined in section 1956 of this title), including any transaction that would be a financial transaction under section 1956 (c)(4)(B) of this title, but such term does not include any transaction necessary to preserve a person's right to representation as guaranteed by the sixth amendment to the Constitution;

**(2)** the term "criminally derived property" means any property constituting, or derived from, proceeds obtained from a criminal offense; and

**(3)** the term "specified unlawful activity" has the meaning given that term in section 1956 of this title.

As presented in the Statement of Facts, Ellipso has engaged in numerous acts of illegal financial transactions involving the proceeds of its criminal racketeering activities. These are set forth in the Exhibits to this Complaint and are incorporated by reference as if fully set forth herein. These acts of money laundering were an integral part of the scheme(s) to defraud the victims including Plaintiffs. This racketeering activity proximately caused injury to Plaintiffs' business(es) and property, as set forth herein.

227. L. Sections 2314 and 2315 (interstate transportation of stolen property):

Provides,

Whoever transports, transmits, or transfers in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud; or

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transports or causes to be transported, or induces any person or persons to travel in, or to be transported in interstate or foreign commerce in the execution or concealment of a scheme or artifice to defraud that person or those persons of money or property having a value of $5,000 or more;

> Whoever receives, possesses, conceals, stores, barters, sells, or disposes of any goods, wares, or merchandise, securities, or money of the value of $5,000 or more, or pledges or accepts as security for a loan any goods, wares, or merchandise, or securities, of the value of $500 or more, which have crossed a State or United States boundary after being stolen, unlawfully converted, or taken, knowing the same to have been stolen, unlawfully converted, or taken;

Ellipso has transported, sold, and transferred, securities and money, knowing the same to have been stolen, or taken by fraud--specifically ICO Global stock and cash belonging to MCHI.  Ellipso has devised a scheme or artifice to defraud, and/or obtain the money and/or property of Plaintiffs by means of false and/or fraudulent pretenses, representations, and/or promises.  Ellipso has caused (induced) Plaintiffs as well as Ellipso's officers, directors, and agents, to travel in interstate and foreign commerce in the execution and/or concealment of its scheme and/artifice to defraud Plaintiffs of Plaintiffs' money and/or property; all as described in the Statement of Facts. Ellipso stole TRSC's revenues from the 881 telephone service and transported same across state and international boundaries.  These acts of interstate and foreign transportation of stolen property were an integral part of the scheme(s) to defraud the victims including Plaintiffs.  This racketeering activity proximately caused injury to Plaintiffs' business(es) and property, as set forth herein

*228.* M.   Offenses which    "… are indictable as … any offense involving fraud connected with a case under title 11 …" (bankruptcy fraud):  This includes offenses indictable pursuant to 18 U.S.C. §§ 152 (concealment of assets, false oaths, bribery), 157 (bankruptcy fraud), and 1519 (destruction or falsification of records in a bankruptcy).  These statutes provide,

Section 152:

A person who—

**(1)** knowingly and fraudulently conceals from a custodian, trustee, marshal, or other officer of the court charged with the control or custody of property, or, in connection with a case under title 11, from creditors or the United States Trustee, any property belonging to the estate of a debtor;

**(2)** knowingly and fraudulently makes a false oath or account in or in relation to any case under title 11;

**(3)** knowingly and fraudulently makes a false declaration, certificate, verification, or statement under penalty of perjury as permitted under section 1746 of title 28, in or in relation to any case under title 11;

**(4)** knowingly and fraudulently presents any false claim for proof against the estate of a debtor, or uses any such claim in any case under title 11, in a personal capacity or as or through an agent, proxy, or attorney;

**(5)** knowingly and fraudulently receives any material amount of property from a debtor after the filing of a case under title 11, with intent to defeat the provisions of title 11;

**(6)** knowingly and fraudulently gives, offers, receives, or attempts to obtain any money or property, remuneration, compensation, reward, advantage, or promise thereof for acting or forbearing to act in any case under title 11;

**(7)** in a personal capacity or as an agent or officer of any person or corporation, in contemplation of a case under title 11 by or against the person or any other person or corporation, or with intent to defeat the provisions of title 11, knowingly and fraudulently transfers or conceals any of his property or the property of such other person or corporation;

**(8)** after the filing of a case under title 11 or in contemplation thereof, knowingly and fraudulently conceals, destroys, mutilates, falsifies, or makes a false entry in any recorded information (including books, documents, records, and papers) relating to the property or financial affairs of a debtor; or

**(9)** after the filing of a case under title 11, knowingly and fraudulently withholds from a custodian, trustee, marshal, or other officer of the court or a United States Trustee entitled to its possession, any recorded information (including books, documents, records, and papers) relating to the property or financial affairs of a debtor,

Section 157:

A person who, having devised or intending to devise a scheme or artifice to defraud and for the purpose of executing or concealing such a scheme or artifice or attempting to do so—

**(1)** files a petition under title 11, including a fraudulent involuntary bankruptcy petition under section 303 of such title;

**(2)** files a document in a proceeding under title 11, including a fraudulent involuntary bankruptcy petition under section 303 of such title; or

**(3)** makes a false or fraudulent representation, claim, or promise concerning or in relation to a proceeding under title 11, including a fraudulent

involuntary bankruptcy petition under section 303 of such title, at any time before or after the filing of the petition, or in relation to a proceeding falsely asserted to be pending under such title,

Section 1519:

Whoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States or any case filed under title 11, or in relation to or contemplation of any such matter or case, shall be fined under this title, imprisoned not more than 20 years, or both.

In both the MCHI bankruptcy filed May 12, 2003 and in the Ellipso bankruptcy filed February 25, 2009, Ellipso violated these criminal statutes by, *inter alia.,* knowingly concealing assets, making false oaths, filing false claims, destroying records, falsifying records, devising schemes and artifices to defraud, and concealing records, all as detailed herein. These acts of bankruptcy fraud were an integral part of the "bust out" scheme(s) employed by Ellipso to defraud its Creditors, including Plaintiffs. This racketeering activity proximately caused injury to Plaintiffs' business(es) and property, as set forth herein.

*229.* Offenses involving " … fraud in the sale of securities … punishable under any law of the United States…" Ellipso sold the stolen ICO Global stock and converted the proceeds to funding its racketeering activities. These fraudulent sales of securities were an integral part of the scheme(s) employed by Ellipso to defraud its Creditors, including Plaintiffs. This racketeering activity proximately caused injury to Plaintiffs' business(es) and property, as set forth herein.

**Ellipso – Count IV:  Violation of 18 U.S.C. § 1962(d).**

*230.*  In violation of 18 U.S.C. § 1962(d), the Defendants, defined as persons pursuant to 18 U.S.C. § 1961, individually and collectively, commencing at various times for each Defendant, from and after 1999, conspired to violate, and did violate 18 U.S.C. § 1962(a), (b), and (c), to obtain, directly or indirectly, control over alternately the Enterprise(s) I through VIII, as set forth herein, each of which is engaged in and affects interstate commerce.

*231.*  This conspiracy to obtain control, or attempt to obtain control, was carried out through a pattern and practice of racketeering activity, employing the instruments of interstate commerce including the mails, wires, and public transportation systems, all as set forth herein.

*232.*  . Defendants, individually and collectively, each received financial gain from their participation in the racketeering activities set forth herein.

*233.*  Plaintiffs suffered injury to their business and property as a consequence the racketeering activities, including this conspiracy by the Defendants to violate 18 U.S.C. §1961 and 1962(a), (b), (c), and (d), as set forth herein.   Plaintiff(s)' injuries were proximately   caused   by   these   racketeering   activities   of   Defendant(s).

**OTHER FEDERAL AND STATE LAW CLAIMS AGAINST ELLIPSO**

**INTRODUCTION:**

*234.* Plaintiffs assert numerous additional federal and state law claims against the Defendants, individually and collectively, based upon both federal and state statutes and the common law.  Some of these claims are for injuries to the Plaintiffs' business(es) and property, and some are for personal injuries inflicted on Plaintiffs by the Defendants. Several of these claims support the racketeering counts previously enumerated, and other claims are for damages distinct from the racketeering claims, seeking damages independent of those racketeering counts.  These state statutory and common law claims asserted against Ellipso are set forth *supra.*

**ELLIPSO  - COUNT V: FRAUD.**

*235.*  As specified herein, Ellipso has defrauded Plaintiffs by committing the following acts of fraud:

    A.  Defrauded MannTech in the stock margin loan;

    B.  Defrauded TRSC in the 881 telephone contract;

    C.  Defrauded TRSC by converting the escrowed moneys from the Sun Trust Account;

    D.  Defrauded TRSC by concealing the 881 revenues to which TRSC is entitled.

*236.* Having defrauded Plaintiffs of these moneys, Ellipso then further defrauded Plaintiffs by dispensing these moneys, and other assets, to the other Defendants herein, to render recovery of these moneys by Plaintiffs from Ellipso impossible.  This "bust out" scheme is the ultimate fraud.

*237.*  The District of Columbia Code provides,

(a) *Fraud in the first degree.* -- A person commits the offense of fraud in the first degree if that person engages in a scheme or systematic course of conduct with intent to defraud or to obtain property of another by means of a false or fraudulent pretense, representation, or promise and thereby obtains property of another or causes another to lose property.

(b) *Fraud in the second degree.* -- A person commits the offense of fraud in the second degree if that person engages in a scheme or systematic course of conduct with intent to defraud or to obtain property of another by means of a false or fraudulent pretense, representation, or promise.

(c) *False promise as to future performance.* -- Fraud may be committed by means of false promise as to future performance which the accused does not intend to perform or knows will not be performed. An intent or knowledge shall not be established by the fact alone that one such promise was not performed.

*238.* Ellipso's fraudulent conveyances of these moneys and assets has proximately caused injury to Plaintiffs in the amount of ten million dollars ($10,000,000.00) or such other amount as may be proved at trial.

**ELLIPSO - COUNT VI:  CONVERSION.**

*239.* Ellipso has wrongfully converted moneys belonging to Plaintiffs, and/or moneys which Ellipso was obligated to apply toward meeting its obligations to Plaintiffs, to its own uses, including financing wrongful litigation against Plaintiffs and dissipation of the moneys to other Defendants herein.

*240.* As stated, MannTech loaned Ellipso one hundred thousand dollars ($100,000.00). TRSC paid Ellipso seventy two thousand dollars ($72,000.00) in royalties and twenty five thousand dollars ($25,000.00) in escrow funds (which were to be applied to develop the 881 telephone services, which Ellipso was obligated to provide.)  Ellipso received in excess of six hundred thousand dollars ($600,000.00) in revenues from the 881 telephone business; of which in excess of one hundred thirty thousand dollars ($130,000.00) belonged to TRSC.

*241.* Ellipso wrongfully converted all of these moneys belonging to Plaintiffs to its own enjoyment; ultimately filing a "bust out" bankruptcy petition to avoid paying Plaintiffs moneys owed to them.

*242.* Ellipso's wrongful conversions of these moneys has proximately caused injury to Plaintiffs in the amount of ten million dollars ($10,000,000.00) or such other amount as may be proved at trial.

**ELLIPSO  - COUNT VII:  NEGLIGENCE.**

*243.* Ellipso allowed its moneys and assets to be dissipated by expenditures on "bad faith" and "quintessentially vexatious" litigations, failure to maintain adequate corporate records, failure to pay just debts, losses of licenses, imposition of sanctions by the courts, failure to file and pay income taxes, exorbitant payments to officers and directors, failure to perform contract obligations, failure to exercise proper corporate governance, and general malfeasances.  This negligence resulted in Ellipso's bankruptcy and loss of all value.

*244.* Ellipso owed a duty to its shareholders, employees, creditors, and business partners, including Plaintiffs, to perform its corporate responsibilities in a legally competent manner.

*245.* Ellipso was negligent in performing its legal corporate responsibilities, as specified herein.

*246.* Plaintiffs, creditors of Ellipso, have been proximately injured by Ellipso's negligence in performing its corporate legal responsibilities in the amount of ten million dollars (10,000,000.00) or such other amount as may be proved at trial.

**ELLIPSO  - COUNT VIII:  GROSS NEGLIGENCE.**

247. Ellipso allowed its moneys and assets to be dissipated by expenditures on "bad faith" and "quintessentially vexatious" litigations, failure to maintain adequate corporate records, failure to pay just debts, losses of licenses, imposition of sanctions by the courts, failure to file and pay income taxes, exorbitant payments to officers and directors, failure to perform contract obligations, failure to exercise proper corporate governance, and general malfeasances.

248. These failures by Ellipso were knowing, deliberate, and calculated, and were without legal justification.

249. These deliberate, knowing, calculated failures by Ellipso to perform its legal obligations constitute gross negligence.

250. Ellipso owed a duty to its shareholders, employees, creditors, and business partners, including Plaintiffs, to perform its corporate responsibilities in a competent legal manner.

251. Plaintiffs, creditors of Ellipso, have been proximately injured by Ellipso's gross negligence in performing its corporate responsibilities in the amount of ten million dollars (10,000,000.00) or such other amount as may be proved at trial.

**ELLIPSO - COUNT IX: DETRIMENTAL RELIANCE.**

252. The Plaintiffs herein relied on Ellipso to perform its legal corporate responsibilities including observing proper corporate governance, refraining from filing 'bad faith" and "quintessentially vexatious" litigations, avoiding judicial sanctions, paying only proper compensation to officers and directors, not committing fraud, and generally behavior consistent with a responsible corporate citizen including not engaging in racketeering activities.

*253.* Plaintiffs had the right to rely on Ellipso to perform its obligations as a legal manner as a responsible corporate citizen.

*254.* Ellipso failed to behave as a responsible corporate citizen by engaging in conduct that was criminal, negligent, grossly negligent, and reprehensible.

*255.* Plaintiffs detrimentally relied on Ellipso to be a responsible corporate citizen and comply with its legal obligations.

*256.* As a consequence of this detrimental reliance on Ellipso, Plaintiffs were proximately injured in the amount of ten million dollars ($10,000,000.00) or such other amount as may be proved at trial.

**ELLIPSO  - COUNT X:  UNJUST ENRICHMENT.**

*257.* Ellipso took and retains moneys and services received from Plaintiffs.  Ellipso took and retains the benefits of these moneys and services, without commensurate compensation to Plaintiffs.

*258.* By accepting and retaining these moneys and services from Plaintiffs, Ellipso has been unjustly enriched.

*259.* By Ellipso's accepting and retaining these moneys and services from Plaintiffs without compensation to Plaintiffs, Ellipso has been unjustly enriched in the amount of ten million dollars ($10,000,000.00) or such other amount as may be prove at trial. Ellipso should be required to disgorge these moneys together with the value of the services provided, and return same to Plaintiffs.

**ELLIPSO  -  COUNT XI:    INTENTIONAL INTERFERENCE WITH
                                            CONTRACTS**

*260.* As specified in the Statement of Facts, Ellipso executed a five year contract with TRSC in December 2003, to provide the 881 telephone service.  Instead of providing that

service pursuant to the contract with TRSC, Ellipso operated its own 881 telephone services commencing in October 2004, concealing this service from TRSC. Thereafter, Ellipso deliberately and knowingly refused to provide the 881 telephone services to TRSC that Ellipso was obligated to provide pursuant to its contract with TRSC.

261. Learning in December 2005, that TRSC had invested in a relationship under which Ellipso's failure and willful refusal to provide the 881 telephone services could be overcome in a contract negotiated with MCI, Ellipso determined to sabotage TRSC's efforts by subverting the contract with MCI.

262. In December 2005, Ellipso also knew that TRSC had a contractual business relationship with John Page ("Page") under which Page had negotiated a contract with MCI that a) overcame Ellipso's willful failure to provide the 881 telephone service to TRSC under its contract with Ellipso and b) provided highly favorable "Gold" rates for the global origination and termination of telephone calls.

263. Ellipso intentionally interfered with both of these TRSC relationships by inducing Page to sign an agreement with Ellipso as a corporate officer, and to have Ellipso sign the MCI contract to the complete exclusion of TRSC while the bad faith litigation by Ellipso against TRSC was ongoing. Thus, Ellipso not only got the loading of its 881 telephone service virtually for free but obtained a global telephone call origination and termination agreement that TRSC had procured to use for its 881 vanity service offerings.

264. As a direct consequence of Ellipso's intentional interference with TRSC's business relationship with Page, and TRSC's impending contract with MCI, TRSC was proximately injured in the amount of one hundred million dollars ($100,000,000.00) or such other amount as may be proved at trial.

**ELLIPSO - COUNT XII:  RESTRAINT OF TRADE AND UNFAIR TRADE PRACTICES**

*265.* As detailed herein, Ellipso sought to exclusively control the 881 telephone business.  To accomplish this, Ellipso engaged in the unfair trade practices detailed above in Count XI.

*266.* These unfair, monopolistic trade practices of Ellipso are prohibited by District of Columbia Code Sections 28-4501, *et seq.*  Specifically D.C. Code Section 28-4503, prohibits any attempts to establish a monopoly.

*267.* Ellipso's monopolistic trade practices in violation of D.C. Code Sections 28-4503, proximately injured Plaintiffs in the amount of one hundred million dollars ($100,000,000.00) or such other amount as may be proved at trial.

*268.* Pursuant to D.C. Code Section 28-4508, Plaintiffs are entitled to an award of treble damages and attorneys' fees for Ellipso's monopolistic practices.

**ELLIPSO - COUNT XIII:  CONSPIRACY TO VIOLATE D.C. CODE SECTIONS 28-4501, *ET SEQ.***

*269.* Plaintiffs re-allege the allegations in Counts XII and XIII as if fully set forth here.

*270.* D.C. Code Section 28-4502 makes it unlawful to conspire to violate D.C. Code Sections 28-4501 *et seq.*

*271.* As alleged herein, Ellipso did conspire with the other Defendants, specifically, but not limited to, D.Castiel, Bailey, Awkard, Helman, C.Castiel, MCHI, VirtualGeo, Ellipso Private Holdings, VGSI, AirStellar, and others unknown at this time, to violate the proscriptions of D.C. Code § 22-4501, *et seq.* by attempting to create, and creating, a monopoly.

*272.* As a consequence of Ellipso's conspiracy to violate the D.C. Code Sections 22-4501 through 4508, Plaintiffs were proximately injured in the amount of one hundred million dollars ($100,000,000.00) or such other amount as may be proved at trial. Plaintiffs are entitled to a trebling of damages, interest, and attorneys' fees pursuant to D.C Code § 22-4508.

## ELLIPSO - COUNT XIV:  VIOLATION OF THE VIRGINIA FAIR TRADE ACT.

*273.* TRSC's principal place of business is in the Commonwealth of Virginia where it conducts its business.  The contract with Ellipso was executed in Virginia and all payments on the transaction originated in Virginia, where most of the business meetings concerning the contract also took place.

*274.* Plaintiffs re-allege Counts XI, XII, and XIII.   These activities by Ellipso constitute a violation of Virginia Code 59.1-9.6, Monopolies Unlawful.

*275.* As a consequence of Ellipso's violation of Virginia Code 59.1-9.6 Plaintiffs have been proximately injured in the amount of one hundred million dollars ($100,000,000.00) or such other amount as may be proved at trial.  Plaintiffs are entitled to a trebling of damages, attorneys' fees, costs, and interest on these damages.

## ELLIPSO - COUNT XV: VIOLATION OF 18 U.S.C. § 201 (BRIBERY) and COMMON LAW BRIBERY.

*276.* In 2004-2007, and thereafter, D.Castiel, C.Castiel, Tomasonni, Helman, Burt, Taylor, Awkard, and Lourie knew that Ellipso was receiving revenues from the 881 telephone business; a portion of which revenues belonged to TRSC.  D.Castiel, C.Castiel, Tomassoni, Helman, Burt, Taylor, Awkard, and Lourie received payments (a portion of which were the proceeds of the racketeering activities) for their cooperation in concealing

these revenues from TRSC. These bribes were for the purpose of defrauding TRSC. As a consequence of these bribes, TRSC did not learn of the theft of its business property and funds until July 2008, enabling the Enterprise(s) to abscond with the moneys. TRSC has never collected those funds and has been proximately injured in its business and property thereby in the amount of ten million dollars ($10,000,000.00) or such other amount as may be proved at trial.

277. The payment of these bribes constitutes violation of 18 U.S.C. § 201, and common law bribery.

**ELLIPSO - COUNT XVI:   VIOLATION OF 18 U.S.C. § 1623 (PERJURY).**

278. Section 1623 provides,

(a) Whoever under oath (or in any declaration, certificate, verification, or statement under penalty of perjury as permitted under section 1746 of title 28, United States Code) in any proceeding before or ancillary to any court or grand jury of the United States knowingly makes any false material declaration or makes or uses any other information, including any book, paper, document, record, recording, or other material, knowing the same to contain any false material declaration, shall be fined under this title or imprisoned not more than five years, or both.

(c) An indictment or information for violation of this section alleging that, in any proceedings before or ancillary to any court or grand jury of the United States, the defendant under oath has knowingly made two or more declarations, which are inconsistent to the degree that one of them is necessarily false, need not specify which declaration is false if—

(1) each declaration was material to the point in question, and
(2) each declaration was made within the period of the statute of limitations for the offense charged under this section.

In any prosecution under this section, the falsity of a declaration set forth in the indictment or information shall be established sufficient for conviction by proof that the defendant while under oath made irreconcilably contradictory declarations material to the point in question in any proceeding before or ancillary to any court or grand jury.

279. The United States District Court has found that Ellipso and David Castiel made multiple material misstatements in discovery, before the District Court, and before the

Court of Appeals.   The details of this perjured testimony are set forth herein.   The foundation of the "bad faith" law suit which Ellipso brought against Plaintiffs was these repeated perjuries.

*280.* In the arbitration proceeding with TRSC, Ellipso and David Castiel repeatedly perjured themselves as set forth herein.

*281.* As a consequence of this repeated perjury by Ellipso, Plaintiffs have been proximately injured in the amount of ten million dollars ($10,000,000.00) or such other amount as may be proved at trial.

### ELLIPSO - COUNT XVII:   VIOLATION OF 18 U.S.C. § 1622 (SUBORNING PERJURY).

*282.* Section 1622 provides,

> Whoever procures another to commit any perjury is guilty of subornation of perjury, and shall be fined under this title or imprisoned not more than five years, or both.

*283.* As detailed herein, Ellipso suborned perjury from John Page in the arbitration proceeding, seeking to coerce Page, as a company employee, to testify falsely. D.Castiel/Ellipso, as well as Awkard and Lourie, sought to have Page portray the efforts of TRSC to overcome the failure of Ellipso to provide the 881 telephone services through TRSC's contract with MCI, as a conspiracy by TRSC to defraud Ellipso by use of the 881 numbers.   [n.b. At the time of the Arbitration in February 2009, TRSC was still unaware that Ellipso had stolen the MCI contract for itself, only learning of this when Ellipso (Debtor) filed its Disclosure Statement and Plan of Reorganization in the bankruptcy proceeding on June 26, 2009.]

*284.* As a consequence of this suborning of perjury by Ellipso, Plaintiffs have been proximately injured in the amount of ten million dollars ($10,000,000.00) or such other amount as may be proved at trial.

### ELLIPSO - COUNT XVIII:   VIOLATION OF 18 U.S.C. § 371 (CONSPIRACY TO COMMIT A FEDERAL FELONY).

*285.* Section 371 provides,

*a.*           If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.

*286.* Ellipso and the other Defendants herein have conspired to violate a host of federal criminal statutes, all as set for the herein.

*287.* Ellipso and the other Defendants herein have conspired to defraud the United States Judiciary by, *inter alia.,* perjury, obstruction of justice, the filing of false pleadings, destruction of evidence, presentation of false documents, concealment of evidence, and otherwise, all as set forth herein.

*288.* As a consequence of these conspiracies by Ellipso, and the other Defendants herein, Plaintiffs have been proximately injured in the amount of ten million dollars ($10,000,000.00) or such other amount as may be proved at trial.

### ELLIPSO - COUNT XIX:  MALICIOUS PROSECUTION.

*289.* Ellipso, through its officers, directors, agents, and counsel initiated and prosecuted the "bad faith" law suit against Plaintiffs, as set forth herein.

*290.* Ellipso had no basis in fact or law for its fraudulent claims against Plaintiffs asserted in that action.

*291.* Ellipso brought and prosecuted that action against Plaintiffs for the improper purpose of harassing, vexing, and wrongfully causing harm to Plaintiffs, individually and in their business(es), professions, and property.   By this unwarranted legal proceeding, Ellipso sought to destroy, and did destroy Plaintiffs' businesses.

*292.* In bringing and prosecuting this "bad faith" legal action, Ellipso acted with malice and ill will toward Plaintiffs, with the intent to harm Plaintiffs, individually and in their professions and business(es).

*293.* The case terminated in Plaintiffs favor with the Court finding that Ellipso, and others, had brought and prosecuted the matter against Plaintiffs in "bad faith."

*294.* As a consequence of Ellipso's malicious prosecution of these legal actions against Plaintiffs, Plaintiffs have suffered direct and consequential damages in the amount of ten million dollars ($10,000,000.00) or such other amount as may be proved at trial. Plaintiffs' damages were proximately caused by Ellipso's malicious prosecution, all as set forth herein.

**ELLIPSO - COUNT XX:   ABUSE OF PROCESS.**

*295.* As noted, Ellipso brought and prosecuted the "bad faith" lawsuit against Plaintiffs with malice.   The principal purposes of the suit were to retaliate against Plaintiffs for MannTech's exercise of its rights, pursuant to the stock margin loan agreement, to retain any "up side" from the sale of the ICO Global stock.   Ellipso had forfeited the shares in October 2004, by failing to make any payment whatsoever to MannTech on the loan. When the sale price of the ICO Global stock increased from less than five cents (<$0.05) per share in October 2004, to more than three dollars ($3.00) per share in June 2005; Ellipso filed the "bad faith" lawsuit to coerce MannTech to return the shares to Ellipso.

*296.* Ellipso had no legal rights to the ICO Global shares that Ellipso had forfeited in October 2004, but filed the "bad faith" lawsuit for the improper purpose of causing MannTech to give up its legal rights and return the shares to Ellipso.  To force MannTech to return the shares, Ellipso sought, and obtained, a Preliminary Injunction freezing the sale of the remaining ICO Global shares which MannTech held, as well as requiring an accounting for the proceeds of any shares which MannTech had already sold.  The Preliminary Injunction also froze any proceeds from the sale of the ICO Global stock, still in MannTech's possession. The Court subsequently found that the Preliminary Injunction had been improvidently granted.

*297.* Congruent with this suit against MannTech, Ellipso also sued MannTech's principles, Mann and Patterson, accusing each of fraud, conversion, racketeering, and other malfeasances.  These allegations were, and are, false.  Ellipso knowingly made these fraudulent claims in the lawsuit for the improper purpose of coercing Mann and Patterson to cause MannTech to abandon its legal rights and return the ICO Global stock to Ellipso.

*298.* Ellipso also filed this fraudulent suit against Mann and Patterson for the improper purpose of ruining them in their professions and business(es); thus extorting them to give up their legal rights and cause MannTech to return the ICO Global stock, as well as the proceeds which they had received from the sales of that stock.  One of the purposes of the suits was to cause Mann and Patterson embarrassments, vexation, consternation, loss of earnings, loss of business, increased expenses and costs, and other economic hardships, damages and injuries; all for the illegal purpose of coercing Mann and Patterson to return the stock to Ellipso.

*299.* Ellipso also sued TRSC in the same action.  Again this was for the purpose of inflicting disrespect, disrepute, and economic hardship on Plaintiffs in an attempt to extort Plaintiffs to abandon their legal rights. Plaintiffs now know that Ellipso also filed the abusive lawsuit against TRSC, to conceal Ellipso's theft of the 881 telephone service revenues and to prevent TRSC from consummating the 881vanity telephone business contract with MCI.

*300.* The filing and prosecution of these fraudulent lawsuits by Ellipso against Plaintiffs constitute an abuse of process in that they were intended to, and did at least partially, effectuate improper and impermissible purposes separate and apart from any legitimate adjudication of Ellipso's legal claims. Specifically, the "bad faith" lawsuit caused TRSC to forego its contract with MCI for the vanity telephone service.

*301.* As a consequence of Ellipso's abuse of process against Plaintiffs, Plaintiffs have suffered direct and consequential damages in the amount of ten million dollars ($10,000,000.00) or such other amount as may be proved at trial.  Plaintiffs' damages were proximately caused by Ellipso's malicious prosecution, all as set forth herein.

**ELLIPSO - COUNT XXI:   VIOLATION OF 18 U.S.C. § 1509 (OBSTRUCTION OR INTERFERENCE WITH COURT ORDER).**

*302.* Section 1509 pertains to anyone who "… by threat of force, willfully prevents, obstructs, impedes, or interferes with, or willfully attempts to prevent, obstruct, impede, or interfere with, the due exercise of rights or the performance of duties under any order, judgment, or decree of a court of the United States,".

*303.* In February 2009, the United States District Court for the District of Columbia issued Writs of Attachment to T.D.Ameritrade, seizing all assets of Ellipso held by T.D.Ameritrade.

*304.* When D.Castiel and Ellipso learned of the issuance of this Writ of Attachment, they contacted T.D.Ameritrade.   On information and belief, D.Castiel/Ellipso asked T.D.Ameritrade to refuse to accept service of the Writ.

*305.* Thereafter, when MannTech's process server attempted to serve this Writ of Attachment on T.D.Ameritrade, Bo Belinsky, the office manager, refused to accept the service and instead told the process server that the writ would have to be served in Omaha, Nebraska. This deception enabled D.Castiel/Ellipso to abscond with all the remaining assets in the account, in the amount of approximately one hundred sixty thousand dollars ($160,000.00).

*306.* In May 2009, Patterson attempted to serve an Order of the Bankruptcy Court requiring T.D.Ameritrade to produce records of Debtor Ellipso's accounts. On that occasion, Patterson was surrounded by personnel of T.D.Ameritrade, including Bo Belinsky, and threatened with physical eviction from the premises. This occurred at T.DAmeritrade's Washington, D.C. office at 14th and Eye Streets, North West.

*307.* To avoid the physical confrontation, Patterson left the subpoena and court order on the floor and quickly departed.

*308.* As a consequence of the actions of T.D.Ameritrade in interfering with and obstructing enforcement of the lawful orders of the United States District Court and the United States Bankruptcy Court,  Plaintiffs have been proximately injured in the amount of ten million dollars ($10,000,000.00) or such other amount as may be proved at trial.

**ELLIPSO - COUNT XXII:  SLANDER, and SLANDER, *PER SE.***

*309.* Commencing on or about October 2004 and continuing to date, Ellipso, D.Castiel, and C.Castiel did make repeated slanderous statements concerning Plaintiffs. To wit, that

Plaintiffs were fraudsters and thieves, and liars, and that Plaintiffs had cheated Ellipso/Castiels. These statements were, and are, *per se* slander. The exact statements, dates, persons present and circumstances of each of these slanderous utterances are unknown to Plaintiffs at this time as this knowledge is particularly within the knowledge of Defendants.

*310.* Plaintiffs do know that on several occasions in or about 2006-08, D.Castiel/Ellipso made slanderous statements to one, James Valentine, to the effect that Plaintiffs were crooks and had cheated D.Castiel/Ellipso,

*311.* Plaintiffs do know that on numerous occasions in or about 2006 to 2009, D.Castiel/Ellipso had numerous conversations with John Page, some of which were in the presence of others, in which D.Castiel/Ellipso stated that Plaintiffs were crooks, that Plaintiffs had cheated Ellipso, that Plaintiffs were liars, that Plaintiffs were thieves, and that Plaintiffs were fraudsters.

*312.* On information and belief, D.Castiel/Ellipso made similar slanderous statements from and after 2004 to, among others, Helman, Bailey, Awkard, Blakley, Burt, Taylor, F. Whitten Peters, Guberman, Ludaway, Goodman, Lourie, Patton, Rosenberg, Goldfarb, and Tomassoni. The precise circumstances of these conversations will be the subject of discovery.

*313.* These statements concerning Plaintiffs' character were false. D.Castiel/Ellipso knew that these statements were false when they were uttered. D.Castiel/Ellipso made these false and slanderous statements concerning Plaintiffs, maliciously, and with the intent that Plaintiffs be harmed in their reputations and business(es) by these false and slanderous statements.

*314.* On information and belief, other officers, directors, agents, employees, counsels, consultants, and others affiliated with Ellipso and/or its affiliated companies, have repeated these slanderous statements concerning Plaintiffs.   These slanderous and derogatory statements about Plaintiffs were made with complete disregard for their truth of falsity.  The exact circumstances of these utterances will be the subject of discovery.

*315.* Plaintiffs' reputations, business(es), and standing in the community have been damaged by these maliciously uttered slanderous statements by D.Castiel/Ellipso, and the other Defendants.

*316.* As a proximate cause of Ellipso/D.Castiel's slander of Plaintiffs, as well as the repetition of these slanderous statements by the other Defendants, Plaintiffs, and their families, have suffered economic losses of business, revenues, profits, fees, and income. As a proximate cause of these slanders of Plaintiffs, Plaintiffs, and their families, have suffered emotional distress, embarrassment, and disrepute in the community.   As a proximate cause of these slanderous statements, Plaintiffs' reputations, and the reputations of Plaintiffs' families, have been injured.

*317.* As a proximate cause of the slanderous campaign against Plaintiffs by Ellipso/D.Castiel and the other Defendants, Plaintiffs have been damaged in the amount of ten million dollars ($10,000,000.00), or such other amount as may be proved at trial. Additionally, Plaintiffs seek exemplary damages, punitive damages, and injunctive relief to require Ellipso and D.Castiel, and any others involved in this campaign of character assignation to cease and desist from making further slanderous statements concerning Plaintiffs.

**ELLIPSO - COUNT XXIII:  LIBEL and LIBEL, *PER SE.***

*318.* Plaintiffs incorporate the allegations of Count XXII as if fully set forth herein. On information and belief, Ellipso/D.Castiel and/or others affiliated with Ellipso made libelous statements concerning Plaintiffs, similar to those set forth above.  At this time the exact statements, authors/recipients/others involved, are unknown to Plaintiffs as this information is particularly within the knowledge of Defendants and will be the subject of discovery.

*319.* On information and belief, the libelous statements made in the course of the "bad faith" lawsuit and the arbitration proceeding, were published to others outside the judicial privilege.  The publications of these libelous statements are not protected by the judicial privilege.  The exact circumstances of these publications are unknown to Plaintiffs at this time and will be the subject of discovery.

*320.* As a proximate cause of Ellipso/D.Castiel's libels of Plaintiffs, Plaintiffs, and their families, have suffered economic losses of business, revenues, profits, fees, and income.  As a proximate cause of Ellipso/D.Castiel's libel of Plaintiffs, Plaintiffs, and their families, have suffered emotional distress, embarrassment, and disrepute in the community.  As a proximate cause of Ellipso/D.Castiel's libelous statements, Plaintiffs' reputations, and the reputations of Plaintiffs' families, have been injured.

*321.* As a proximate cause of Elliipso/D.Castiel's libelous campaign against Plaintiffs, Plaintiffs have been damaged in the amount of ten million dollars ($10,000,000.00), or such other amount as may be proved at trial.  Additionally, Plaintiffs seek exemplary damages, punitive damages, and injunctive relief to require Ellipso and D.Castiel, and any others involved in this campaign of character assignation to cease and desist from making further libelous statements concerning Plaintiffs.

**ELLIPSO - COUNT XXIV:  DEFAMATION.**

*322.*  Plaintiffs re-assert Counts XXII and XXIII as if fully set forth herein.  Plaintiffs were defamed by the repeated derogatory statements uttered by Ellipso/D.Castiel/C.Castiel and others affiliated with them.

*323.*  As a consequence of these false derogatory statements (this pogrom of character assignation) Plaintiffs have been damaged in the amount of ten million dollars ($10,000,000.00), or such other amount as may be proved at trial.  Additionally, Plaintiffs seek exemplary damages, punitive damages, and injunctive relief to require Ellipso and D.Castiel, and any others involved in this campaign of character assignation to cease and desist from making further defamatory statements concerning Plaintiffs.

**ELLIPSO - COUNT XXV:  INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS.**

*324.*  Plaintiffs re-assert Counts XXII, XXIII, and XXIV as if fully set forth herein.

*325.*  Ellipso, D.Castiel, C.Castiel, and others affiliated with them including the other Defendants herein, conceived, designed, implemented, launched, pursued, and prosecuted a campaign against Plaintiffs for the purpose of intentionally inflicting emotional distress on Plaintiffs.  This consisted of, among other things, slander, defamation, libel, filing false lawsuits, harassment, and other malicious acts.  This campaign of abuse directed toward Plaintiffs was knowing, deliberate, calculated, intentional, malicious, and mean. The purpose of this malevolent campaign against Plaintiffs was for the purpose of intimidating, coercing, extorting, and scaring Plaintiffs to give up their legal rights to retain the ICO Global stock, which Ellipso had forfeited by its failure to repay the loan from MannTech; to retain the stolen 881 revenues; and to inflict personal harm on Plaintiffs.

*326.* The other purposes of the campaign against Plaintiffs were simply revenge and meanness. The intent of the attacks on Plaintiffs was to hurt them and cause them extreme emotional and financial distress.

*327.* The actions taken, and utterances made, against and about Plaintiffs were, and are reprehensible, disgusting, scurrilous, and beyond any acceptable pattern of conduct.

*328.* As a proximate cause of this campaign against them, Plaintiffs suffered extreme emotional distress, as well as financial hardship, embarrassment, ridicule, humiliation, derision, and ostracism. Ellipso/D.Castiel/C.Castiel's actions caused Plaintiffs to suffer the loss of status in the community with its concomitant loss of business and income.

*329.* Personally, Plaintiffs suffered severe degradation of their business life, their family life, and the very enjoyment of life.

*330.* By the actions of Ellipso/D.Castiel/C.Castiel and their compatriots, in intentionally inflicting emotional distress on Plaintiffs, Plaintiffs have been damaged in the amount of ten million dollars ($10,000,000.00), or such other amount as may be proved at trial. Additionally, Plaintiffs seek exemplary damages, punitive damages, and injunctive relief to require Ellipso the Castiels, and any others involved in this campaign of infliction of emotional distress to cease and desist from their attacks on Plaintiffs.

### ELLIPSO - COUNT XXVI:  AIDING AND ABETTING.

*331.* Ellipso and the other Defendants committed the acts of racketeering and other illegalities enumerated herein. To the extent that these racketeering acts and other illegalities were committed by the other Defendants, Ellipso had knowledge of these illegal acts.

*332.* Ellipso either participated in, or provided substantial assistance in effectuating these racketeering acts and other illegalities by, *inter alia.,* providing funding, direction, support, concealment, encouragement, and facilities for these acts.

*333.* These actions by Ellipso constitute aiding and abetting the commission of the racketeering acts and other illegal acts perpetrated by the Defendants herein against Plaintiffs.

*334.* By aiding and abetting the commission of these racketeering acts and other acts of illegality against Plaintiffs, Ellipso proximately injured Plaintiffs in their property and business(es), as well as personally.

*335.* Plaintiffs suffered damages from Ellipso's aiding and abetting the commission of these acts against Plaintiffs, in the amount of ten million dollars ($10,000,000.00), or such other amount as may be proved at trial.

### ELLIPSO - COUNT XXVII:  *RESPONDENT SUPERIOR.*

*336.* The acts of racketeering and other illegalities set forth herein were committed and carried out by Ellipso's officers, directors, employees, agents, servants, consultants, counsels, and others under the direction and control of Ellipso.  Consequently, Ellipso is responsible for damages and injuries caused by their conduct pursuant to the doctrine of *respondent superior.*

### ELLIPSO - COUNT XXVIII:  COMMON LAW CONSPIRACY, AGENCY.

*337.* Ellipso and the other Defendants herein, individually and collectively, were and are engaged in a conspiracy to defraud and each of them is liable for the actions of the other as if they themselves had committed the acts. All Defendants were acting as the agents of the others with either express or implied authority to so act in furtherance of

their common goal to operate a RICO enterprise and all Defendants benefited financially therefrom and ratified the acts of the others. Therefore, all Defendants are jointly and severally liable for the actions of every other Defendant committed in furtherance of the conspiracy.

*338.* Each Defendant shared and acted on the common goal of advancing the financial well being of the various businesses and enterprises, as well as their own individual financial well being. Each was aware of the overall scheme(s), and chose to assist in effectuating those schemes. Each Defendant acted in furtherance of those goals and received financial benefits there from.

*339.* These joint cooperative efforts by each Defendant constitute a conspiracy pursuant to common law.

### COUNTS ALLEGED AGAINST DAVID CASTIEL AND CAMERAN CASTIEL

*340.* The Counts alleged against David Castiel and Cameran Castiel are as follows:

*341.* The Racketeering Counts:

>> Count I, Violation of 18 U.S.C. § 1962(a),

>> Count II, (Violation of 18 U.S.C. § 1962(b)),

>> Count III, Violation of 18 U.S.C. § 1962(c), and

>> Count IV, Violation of 18 U.S.C. § 1962(d),

are incorporated by reference as if fully set forth herein. These Counts should substitute David Castiel, Cameran Castiel, and/or the Castiel Family for Ellipso in these Counts.

*342.* The Larceny Counts:

>> Count V, Fraud, and

>> Count VI, Conversion,

are incorporated by reference as if fully set forth herein. These Counts should substitute David Castiel, Cameran Castiel, and/or the Castiel Family for Ellipso in these Counts.

343. The Negligence Counts:

> Count VII, Negligence,
>
> Count VIII, Gross Negligence, and
>
> Count XIX, Detrimental Reliance,

are incorporated by reference as if fully set forth herein. These Counts should substitute that David Castiel, Cameran Castiel, and/or the Castiel Family caused Ellipso and the other Defendants to commit the acts of negligence, gross negligence, and detrimental reliance.

344. The Equitable Count:

> Count X, Unjust Enrichment,

is incorporated by reference as if fully set forth herein. In this Count, David Castiel, Cameran Castiel, and/or the Castiel Family should be substituted for Ellipso.

345. The Unfair Trade Counts:

> Count XI, Intentional Interference With Contracts,
>
> Count  XII, Restraint of Trade and Unfair Trade Practices,
>
> Count XIII, Conspiracy to Violate D.C. Code §§ 28-4501, *et seq.,*  and
>
> Count XIV, Violation of the Virginia Fair Trade Act,

are incorporated by reference as if fully set forth herein. In these Counts, Ellipso should be replaced by David Castiel, Cameran Castiel, and/or the Castiel Family, with the allegation that their actions caused the alleged illegal conduct.

*346.*   The Bribery Count:

>    Count XV, Bribery and Common Law Bribery

are incorporated by reference as if fully set forth herein, as written.

*347.*   The Perjury Counts:

>    Count XVI, Violation of 18 U.S.C. § 1623, Perjury, and

>    Count XVII, Violation of 18 U.S.C. § 1622, Suborning Perjury,

are incorporated by reference as if fully set forth herein.   In these Counts, Ellipso should be replaced by David Castiel, Cameran Castiel, and/or The Castiel Family.

*348.*   The Statutory Conspiracy Count:

>    Count XVIII, Violation of 18 U.S.C. § 371, Conspiracy to Commit a
>                                              Federal Felony,

is incorporated by reference as if fully set forth herein.   In this Count, David Castiel, Cameran Castiel, and/or the Castiel Family, individually and/or collectively should be substituted for Ellipso.

*349.*   The "Bad Faith" Litigation Counts:

>    Count XIX, Malicious Prosecution, and

>    Count XX, Abuse of Process,

are incorporated herein by reference as if fully set forth herein.   These two Counts should be read that David Castiel, Cameran Castiel, and/or the Castiel Family, individually and/of collectively committed, or caused the events supportive of these claims.

*350.*   The Obstruction of Court Orders Count:

>    Count XXI, Violation of 18 U.S.C. § 1509, Obstruction or Interference
>                                              With Court Order,

is incorporated by reference as if fully set forth herein.  This Count should be read as substituting David Castiel, Cameran Castiel, and/or the Castiel Family for Ellipso.

*351.*  The Counts for Slander, Libel, and Defamation:

> Count XXII, Slander and Slander *per se,*
>
> Count XXIII, Libel and Libel *per se,*
>
> Count XXIV, Defamation, and
>
> Count XXV, Intentional Inflection of Emotional Distress,

are incorporated by reference as if fully set forth herein.  In each of these Counts, Ellipso should be replaced by David Castiel, Cameran Castiel, and/or the Castiel Family.

*352.*  The Conspiracy and Aiding and Abetting Counts:

> Count XXVI, Aiding and Abetting, and
>
> Count XXVIII, Common Law Conspiracy, Agency,

are incorporated by reference as if fully set forth herein.  In these Counts, David Castiel, Cameran Castiel, and/or the Castiel Family should be substituted for Ellipso.

**DAVID CASTIEL – COUNT XXIX: INCOME TAX EVASION,
CAMERAN CASTIEL - INCOME TAX FRAUD.**

*353.*  The financial statements of Ellipso; the bank records of Ellipso; and the tax returns of Ellipso; each show differing amounts of compensation for David and Cameran Castiel for tax years 2004, 2005, 2006, 2007, and 2008.  Additionally, the amounts of compensation claimed in filings in the bankruptcy proceeding, *In re: Ellipso (Debtor), No. 09-0148,* show yet another set of amounts for the Castiels' compensation.  In information of belief, the Castiels have failed to maintain proper, legal, corporate accounts, for the purpose of evading income and other taxes by filing fraudulent

corporate and personal tax returns; all for the purpose of concealing their racketeering activities.

*354.* This income tax evasion and fraud has enabled the Castiels to loot their companies, thus depriving their Creditors, including Plaintiffs of payment for just debts. As a proximate cause of this tax evasion and the filing of fraudulent income tax returns, Plaintiffs have been injured in their property and business(es) in the amount of ten million dollars ($10,000,000.00) or such other amount as may be proved at trial.

**DAVID CASTIEL - COUNT XXX:  VIOLATION OF 15 U.S.C. 78,  *ET SEQ.* (FOREIGN CORRUPT PRACTICES ACT).**

*355.*  On information and belief, D.Castiel, Tomassoni, Ellipso, and others unknown at this time, engaged in conduct violative of 15 U.S.C. 78, *et seq.,* in connection with the provision and operation of the audiotext telephone services between October 2004 and sometime in 2007.   These services included the transmission of wagers and other gambling information, and the transmission for sale of pornographic messages and materials.

*356.* On information and belief, to facilitate these illegal operations, D.Castiel, Tomassoni, Ellipso, and others unknown at this time, offered to make payments, and did make, payments, to foreign officials and/or officials of foreign instrumentalities, for the purpose of illicitly procuring and concealing the audiotext business.  The funds used to corruptly influence these foreign officials were, at least in part, the proceeds of the racketeering activities engaged in by the Defendants herein.

*357.*  As a consequence of the employment of the proceeds of the racketeering activities specified herein to corrupt these foreign officials, the assets and attentions of the enterprise(es) were diverted to these illegal activities; to the detriment of performance of

the obligations, including payment of moneys owed, to Plaintiffs.  As a result, Plaintiffs have been injured in their professions, business(es), property, and personally in the amount of ten million dollars ($10,000,000.00) or such other amount as may be proved at trial.

**DAVID CASTIEL –**
**CAMERAN CASTIEL - COUNT XXXI:  PIERCE THE**
**CORPORATE VEIL.**

*358.* The distinctions, actual and legal, between the Castiels, individually and collectively, and the various corporate entities (Ellipso, MCHI, VGHI, Ellipso Private Holdings, AirStellar, VirtualGeo, ESBH) are non-existent.   Only one corporate entity, Ellipso, has a bank account; through which all transactions for each and every one of the various corporate entities are processed.

*359.* The Castiels have testified that they moved funds among and between their personal financial accounts and those of Elliso, (and previously others of the corporate family when some did have separate financial accounts) as if by osmoses – repeatedly paying the Castiels' personal telephone bills, credit card bills, and even parking tickets from the corporate accounts (Arbitration Transcript, February 19, 2009, testimony of David Castiel, p.   ).   On occasion the Castiels simply withdrew cash from the corporate accounts with the company ATM cards. (*Id.* ).  The Castiels' used the corporate financial accounts as their "personal piggy bank."    (A copy of the relevant portions of the Arbitration Transcript are attached as Exhibit    , and incorporated by reference as if fully set forth herein.)

*360.* On occasion, the Castiels, both David and Cameran would deposit their personal funds in the corporate financial accounts.  D.Castiel has characterized these as "loans" to

the corporations, although no documentation of these transactions appears to exist. (See, Arbitration Transcript, p.    ).

*361.*  No proper, much less audited, financial accounts exist for any entity from and after 1999.  No proper corporate records of any sort have been maintained for any of the entities from and after 1999.

*362.*  All records, such as they are, for every entity, are maintained on D.Castiel's personal lap top, and on C.Castiel's home computer, to which no one else has access. [The Plaintiffs; repeated attempts to obtain access to these computers in the United States District Court Case, *Ellipso v. Mann, Id.,* and in the Arbitration, *TRSC v. Ellipso, Id.,* were thwarted by the Castiels and their various attorneys.)

*363.*  Proper licensure, as well as designation of Corporate Agents for Service of Process, for the corporate entities, has been ignored.  All corporate offices for every entity are co-located in the Castiels' home, and the separate business address given to anyone who inquires, is a post office box in a Mail Boxes, Etc. facility on Massachusetts Avenue, N.W.

*364.*  The Castiels are the sole corporate officers in each of the corporate entities except for Defendant Helman who is a Vice President of Ellipso and the other member of the Board of Managers of VirtualGeo with D.Castiel; and Defendant Burt who is the only Ellipso Board member other than D.Castiel,   The last Ellipso Board Meeting was a telephone conference sometime in 2007, and on information and belief, no corporate governance meetings for any of the other entities has been held since 2005. (See, Arbitration Tr., Feb. 19, 2009, p.    )

*365.* The Castiels are the controlling shareholder, directly or indirectly, in each of the corporate entities. D.Castiel is the Chief Operating Officer, Chairman of the Board (or Managing Member of the Board of Managers of the LLCs), President, Corporate Secretary, and Corporate Treasurer (exercising sole and exclusive signatory authority on all financial accounts) for each of the corporate entities. The corporate structure(s) are a sham.

*366.* On information and belief, several corporate entities have simply shut down, without observing the proper legal formalities. These entities include Ellipsat Corporation, Ellipsat International, and Ineva.com, Inc. Absent compliance with the legal requirements to liquidate the assets and pay all debts, the owners, and here officers and directors become liable for any outstanding corporate obligations.

*367.* Since 2005, the Castiels have removed in excess of two million dollars ($2,000,000.00) from these corporate shells, by liquidating all corporate assets. On information and belief, this liquidation of all corporate assets was done by the Castiels without the authorization, and in some cases knowledge, of the corporate governing bodies. Often these liquidations of corporate assets were made at "fire sale" prices, to enable the Castiels to make excessive, unwarranted, and unauthorized payments to themselves -- obviously to meet the Castiels' personal financial needs at the time.

*368.* After stripping the corporate shells of all salable assets, the Castiels dumped them into bankruptcy, in a classic "bust out" scheme, designed to avoid payment of all just debts, including the debts owed to Plaintiffs. During the time when the Castiels were paying themselves more than two mission dollars ($2,000,000.00), 2004 to 2009, the corporations were insolvent.

*369.* As a consequence of these concerted actions by the Castiels', Plaintiffs were proximately injured in the amount of ten million dollars ($10,000,000.00), or such other amount as may be proved at trial.

**COUNTS ALLEGED AGAINST THE OTHER CORPORATE DEFENDANTS**

**ELLIPSO PRIVATE HOLDINGS,  LLC; VIRTUAL GEO SATELLITE, LLC;
MOBILE COMMUNICATIONS HOLDINGS, INC.;
ESBH, INC.; AIRSTELLAR, INC.; INEVA.COM, INC.;
ELLIPSAT INTERNATIONAL; AND ELLIPSAT CORPORATION**

*370.* The following Counts are alleged against the other Corporate Defendants, and are incorporated by reference as if fully set forth herein.  In each of these Counts, the names of the Other Corporate Defendants, individually and collectively, are to be substituted for those of Ellipso and/or D.Castiel, C.Castiel, and/or the Castiel Family.

The Racketeering Counts:

Count I, Violation of 18 U.S.C. § 1962(a),

Count II, (Violation of 18 U.S.C. § 1962(b)),

Count III, Violation of 18 U.S.C. § 1962(c), and

Count IV, Violation of 18 U.S.C. § 1962(d),

The Larceny Counts:

Count V, Fraud, and

Count VI, Conversion,

The Negligence Counts:

Count VII, Negligence,

Count VIII, Gross Negligence, and

Count XIX, Detrimental Reliance,

The Equitable Count:

Count X, Unjust Enrichment,

The Unfair Trade Counts:

Count XI, Intentional Interference With Contracts,

Count  XII, Restraint of Trade and Unfair Trade Practices,

Count XIII, Conspiracy to Violate D.C. Code §§ 28-4501, *et seq.,*  and

Count XIV, Violation of the Virginia Fair Trade Act,

The Bribery Count:

Count XV, Bribery and Common Law Bribery

The Perjury Counts:

Count XVI, Violation of 18 U.S.C. § 1623, Perjury, and

Count XVII, Violation of 18 U.S.C. § 1622, Suborning Perjury,

The Statutory Conspiracy Count:

Count XVIII, Violation of 18 U.S.C. § 371, Conspiracy to Commit a
Federal Felony,

The "Bad Faith" Litigation Counts:

Count XIX, Malicious Prosecution, and

Count XX, Abuse of Process,

The Conspiracy and Aiding and Abetting Counts:

Count XXVI, Aiding and Abetting, and

Count XXVIII, Common Law Conspiracy, Agency,

The *RESPONDENT SUPERIOR* Count:

Count XXVII, *Respondent Superior,*

The Income Tax Counts:

Count XXIX, Income tax Evasion, Income Tax Fraud.

## COUNTS ALLEGED AGAINST GERALD HELMAN

*371.* The following Counts are alleged against Defendant, Gerald Helman, and are incorporated by reference as if fully set forth herein.  In each of these Counts, the name Gerald Helman, is to be substituted for those of Ellipso and/or D.Castiel, C.Castiel, and/or the Castiel Family.

  The Racketeering Counts:

     Count I, Violation of 18 U.S.C. § 1962(a),

     Count II, (Violation of 18 U.S.C. § 1962(b)),

     Count III, Violation of 18 U.S.C. § 1962(c), and

     Count IV, Violation of 18 U.S.C. § 1962(d),

  The Larceny Counts:

     Count V, Fraud, and

     Count VI, Conversion,

  The Negligence Counts:

     Count VII, Negligence,

     Count VIII, Gross Negligence, and

     Count XIX, Detrimental Reliance,

  The Equitable Count:

     Count X, Unjust Enrichment,

  The Unfair Trade Counts:

     Count XI, Intentional Interference With Contracts,

     Count  XII, Restraint of Trade and Unfair Trade Practices,

     Count XIII, Conspiracy to Violate D.C. Code §§ 28-4501, *et seq.,*  and

Count XIV, Violation of the Virginia Fair Trade Act,

The Bribery Count:

Count XV, Bribery and Common Law Bribery

The Statutory Conspiracy Count:

Count XVIII, Violation of 18 U.S.C. § 371, Conspiracy to Commit a
Federal Felony,

The Counts for Slander, Libel, and Defamation:

Count XXII, Slander and Slander *per se,*

Count XXIII, Libel and Libel *per se,*

Count XXIV, Defamation, and

Count XXV, Intentional Inflection of Emotional Distress,

The Conspiracy and Aiding and Abetting Counts:

Count XXVI, Aiding and Abetting, and

Count XXVIII, Common Law Conspiracy, Agency.

## COUNTS ALLEGED AGAINST JUAN TOMASSONI

*372.* The following Counts are alleged against Defendant, Juan Tomassoni, and are incorporated by reference as if fully set forth herein.  In each of these Counts, the name Juan Tomassoni, is to be substituted for those of Ellipso and/or D.Castiel, C.Castiel, and/or the Castiel Family.

The Racketeering Counts:

Count I, Violation of 18 U.S.C. § 1962(a),

Count II, (Violation of 18 U.S.C. § 1962(b)),

Count III, Violation of 18 U.S.C. § 1962(c), and

Count IV, Violation of 18 U.S.C. § 1962(d),

The Larceny Counts:

>Count V, Fraud, and

>Count VI, Conversion,

The Equitable Count:

>Count X, Unjust Enrichment,

The Unfair Trade Counts:

>Count XI, Intentional Interference With Contracts,

>Count  XII, Restraint of Trade and Unfair Trade Practices,

>Count XIII, Conspiracy to Violate D.C. Code §§ 28-4501, *et seq.,*  and

>Count XIV, Violation of the Virginia Fair Trade Act,

The Bribery Count:

>Count XV, Bribery and Common Law Bribery

The Statutory Conspiracy Count:

>Count XVIII, Violation of 18 U.S.C. § 371, Conspiracy to Commit a
>Federal Felony,

The Counts for Slander, Libel, and Defamation:

>Count XXII, Slander and Slander *per se,*

>Count XXIII, Libel and Libel *per se,*

>Count XXIV, Defamation, and

>Count XXV, Intentional Inflection of Emotional Distress,

The Conspiracy and Aiding and Abetting Counts:

>Count XXVI, Aiding and Abetting, and

>Count XXVIII, Common Law Conspiracy, Agency.

The Foreign Corrupt Practices Act Count:

Count XXX, Violation of 15, U.S.C. 78 *et seq.*

**COUNTS ALLEGED AGAINST JAMES BAILEY**

*373.* The following Counts are alleged against James Bailey, and are incorporated by reference as if fully set forth herein. In each of these Counts, the name James Bailey is to be substituted for those of Ellipso and/or D.Castiel, C.Castiel, and/or the Castiel Family.

The Racketeering Counts:

Count I, Violation of 18 U.S.C. § 1962(a),

Count II, (Violation of 18 U.S.C. § 1962(b)),

Count III, Violation of 18 U.S.C. § 1962(c), and

Count IV, Violation of 18 U.S.C. § 1962(d),

The Larceny Counts:

Count V, Fraud, and

Count VI, Conversion,

The Negligence Counts:

Count VII, Negligence,

Count VIII, Gross Negligence, and

Count XIX, Detrimental Reliance,

The Equitable Count:

Count X, Unjust Enrichment,

The Bribery Count:

Count XV, Bribery and Common Law Bribery

The Perjury Counts:

Count XVI, Violation of 18 U.S.C. § 1623, Perjury, and

Count XVII, Violation of 18 U.S.C. § 1622, Suborning Perjury,

The Statutory Conspiracy Count:

Count XVIII, Violation of 18 U.S.C. § 371, Conspiracy to Commit a
Federal Felony,

The Counts for Slander, Libel, and Defamation:

Count XXII, Slander and Slander *per se,*

Count XXIII, Libel and Libel *per se,*

Count XXIV, Defamation, and

Count XXV, Intentional Inflection of Emotional Distress,

The Conspiracy and Aiding and Abetting Counts:

Count XXVI, Aiding and Abetting, and

Count XXVIII, Common Law Conspiracy, Agency.

## COUNTS ALLEGED AGAINST LINDA AWKARD and LINDA AWKARD and ASSOCIATES, CHARTERED

*374.* The following Counts are alleged against Linda Awkard, and Linda Awkard and

Associates, Chartered, and are incorporated by reference as if fully set forth herein.  In

each of these Counts, the name Linda Awkard and/or Linda Awkard and Associates

Chartered, is to be substituted for those of Ellipso and/or D.Castiel, C.Castiel, and/or the

Castiel Family.

The Racketeering Counts:

Count I, Violation of 18 U.S.C. § 1962(a),

Count II, (Violation of 18 U.S.C. § 1962(b)),

Count III, Violation of 18 U.S.C. § 1962(c), and

Count IV, Violation of 18 U.S.C. § 1962(d),

The Larceny Counts:

      Count V, Fraud, and

      Count VI, Conversion,

The Negligence Counts:

      Count VII, Negligence,

      Count VIII, Gross Negligence, and

      Count XIX, Detrimental Reliance,

The Equitable Count:

      Count X, Unjust Enrichment,

The Unfair Trade Counts:

      Count XI, Intentional Interference With Contracts,

      Count  XII, Restraint of Trade and Unfair Trade Practices,

      Count XIII, Conspiracy to Violate D.C. Code §§ 28-4501, *et seq.,* and

      Count XIV, Violation of the Virginia Fair Trade Act,

The Bribery Count:

      Count XV, Bribery and Common Law Bribery

The Perjury Counts:

      Count XVI, Violation of 18 U.S.C. § 1623, Perjury, and

      Count XVII, Violation of 18 U.S.C. § 1622, Suborning Perjury,

The Statutory Conspiracy Count:

      Count XVIII, Violation of 18 U.S.C. § 371, Conspiracy to Commit a
                                    Federal Felony,

The "Bad Faith" Litigation Counts:

      Count XIX, Malicious Prosecution, and

Count XX, Abuse of Process,

The Counts for Slander, Libel, and Defamation:

Count XXII, Slander and Slander *per se,*

Count XXIII, Libel and Libel *per se,*

Count XXIV, Defamation, and

Count XXV, Intentional Inflection of Emotional Distress,

The Conspiracy and Aiding and Abetting Counts:

Count XXVI, Aiding and Abetting, and

Count XXVIII, Common Law Conspiracy, Agency.

The *RESPONDENT SUPERIOR* Count:

Count XXVII, *Respondent Superior,*

## LINDA AWKARD, – COUNT XXXII: VIOLATION OF 28 U.S.C. §1927  LINDA AWKARD and ASSOCIATES, CHARTERED (UNREASONABLY AND VEXATIOUSLY MULTIPLY JUDICIAL PROCEEDINGS)

*375.* Section 1927 provides;

> Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

*376.* Awkard instigated and prosecuted the "bad faith" lawsuit against Plaintiffs from and after June 2005.  The filing of a baseless lawsuit quintessentially multiplies the proceedings unreasonably and vexatiously.  Moreover, Awkard and her co-counsel continually and repeatedly requested numerous continuances for the purpose of extending the proceedings and requiring Plaintiffs to expend exorbitant amounts on attorneys' fees and costs.  During three years of discovery, only four depositions were taken.  The

balance of the time was consumed by endless procedural and discovery motions filed by Awkard and her co-counsel, which caused Plaintiffs to incur in excess of one million dollars ($1,000,000,00) in attorneys' fees, costs, and other expenses.

*377.* As a proximate cause of Awkard's violation of Section 1927, Plaintiffs have incurred in excess of one million dollars ($1,000,000.00) in attorneys' fees and other costs, or such other amount as may be proved at trial.

## COUNTS ALLEGED AGAINST MARK GUBERMAN, MATHEW GOODMAN, NATALIE LUDAWAY, and LEFTWICH & LUDWAY, LLP

*378.* The following Counts are alleged against Mark Guberman, Mathew Goodman, Natalie Ludaway, and Leftwich & Ludaway, LLP,  and are incorporated by reference as if fully set forth herein.  In each of these Counts, the name(s) Mark Guberman, Mathew Goodman, Natalie Ludaway, and/or Leftwich & Ludaway, LLP, is/are to be substituted for those of Ellipso and/or D.Castiel, C.Castiel, and/or the Castiel Family, and/or Awkard.

The Racketeering Counts:

Count I, Violation of 18 U.S.C. § 1962(a),

Count II, (Violation of 18 U.S.C. § 1962(b)),

Count III, Violation of 18 U.S.C. § 1962(c), and

Count IV, Violation of 18 U.S.C. § 1962(d);

The Equitable Count:

Count X, Unjust Enrichment,

The Perjury Counts:

Count XVI, Violation of 18 U.S.C. § 1623, Perjury, and

Count XVII, Violation of 18 U.S.C. § 1622, Suborning Perjury,

The Statutory Conspiracy Count:

>Count XVIII, Violation of 18 U.S.C. § 371, Conspiracy to Commit a
>Federal Felony,

The "Bad Faith" Litigation Counts:

>Count XIX, Malicious Prosecution, and

>Count XX, Abuse of Process,

The Counts for Slander, Libel, and Defamation:

>Count XXII, Slander and Slander *per se,*

>Count XXIII, Libel and Libel *per se,*

>Count XXIV, Defamation, and

>Count XXV, Intentional Inflection of Emotional Distress,

The Conspiracy and Aiding and Abetting Counts:

>Count XXVI, Aiding and Abetting, and

>Count XXVIII, Common Law Conspiracy, Agency.

The *RESPONDENT SUPERIOR* Count:

>Count XXVII, *Respondent Superior,*

The Violation of 28 U.S.C. § 1927 Count:

>Count XXXII, Violation of 28 U.S.C.§ 1927, Unreasonably and
>vexatiously multiply judicial proceedings.

## COUNTS ALLEGED AGAINST VANESSA CARPENTER LOURIE, and VANESSA CARPENTER LOURIE, LLP

*379.* The following Counts are alleged against Vanessa Carpenter Lourie, and Vanessa Carpenter Lourie, LLP, and are incorporated by reference as if fully set forth herein. In each of these Counts, the name(s), Vanessa Carpenter Lourie, and Vanessa Carpenter

Lourie, LLP, is/are to be substituted for those of Ellipso and/or D.Castiel, C.Castiel, and/or the Castiel Family, and/or Awkard.

The Racketeering Counts:

Count I, Violation of 18 U.S.C. § 1962(a),

Count II, (Violation of 18 U.S.C. § 1962(b)),

Count III, Violation of 18 U.S.C. § 1962(c), and

Count IV, Violation of 18 U.S.C. § 1962(d);

The Larceny Counts:

Count V, Fraud, and

Count VI, Conversion,

The Equitable Count:

Count X, Unjust Enrichment,

The Bribery Count:

Count XV, Bribery and Common Law Bribery

The Perjury Counts:

Count XVI, Violation of 18 U.S.C. § 1623, Perjury, and

Count XVII, Violation of 18 U.S.C. § 1622, Suborning Perjury,

The Statutory Conspiracy Count:

Count XVIII, Violation of 18 U.S.C. § 371, Conspiracy to Commit a
Federal Felony,

The "Bad Faith" Litigation Counts:

Count XIX, Malicious Prosecution, and

Count XX, Abuse of Process,

The Counts for Slander, Libel, and Defamation:

Count XXII, Slander and Slander *per se,*

Count XXIII, Libel and Libel *per se,*

Count XXIV, Defamation, and

Count XXV, Intentional Inflection of Emotional Distress,

The Conspiracy and Aiding and Abetting Counts:

Count XXVI, Aiding and Abetting, and

Count XXVIII, Common Law Conspiracy, Agency.

The *RESPONDENT SUPERIOR* Count:

Count XXVII, *Respondent Superior,*

The Violation of 28 U.S.C. § 1927 Count:

Count XXXII, Violation of 28 U.S.C.§ 1927, Unreasonably and vexatiously multiply judicial proceedings.

## COUNTS ALLEGED AGAINST RICHARD BURT AND MICHAEL TAYLOR

*380.* The following Counts are alleged against Richard Burt and Michael Taylor, and are incorporated by reference as if fully set forth herein.  In each of these Counts, the name Richard Burt or Michael Taylor, is to be substituted for those of Ellipso and/or D.Castiel, C.Castiel, and/or the Castiel Family, or Awkard.

The Racketeering Counts:

Count I, Violation of 18 U.S.C. § 1962(a),

Count II, (Violation of 18 U.S.C. § 1962(b)),

Count III, Violation of 18 U.S.C. § 1962(c), and

Count IV, Violation of 18 U.S.C. § 1962(d),

The Larceny Counts:

Count V, Fraud, and

Count VI, Conversion,

The Negligence Counts:

Count VII, Negligence,

Count VIII, Gross Negligence, and

Count XIX, Detrimental Reliance,

The Equitable Count:

Count X, Unjust Enrichment,

The Unfair Trade Counts:

Count XI, Intentional Interference With Contracts,

Count  XII, Restraint of Trade and Unfair Trade Practices,

Count XIII, Conspiracy to Violate D.C. Code §§ 28-4501, *et seq.,*  and

Count XIV, Violation of the Virginia Fair Trade Act,

The Bribery Count:

Count XV, Bribery and Common Law Bribery

The Perjury Counts:

Count XVI, Violation of 18 U.S.C. § 1623, Perjury, and

Count XVII, Violation of 18 U.S.C. § 1622, Suborning Perjury,

The Statutory Conspiracy Count:

Count XVIII, Violation of 18 U.S.C. § 371, Conspiracy to Commit a
Federal Felony,

The "Bad Faith" Litigation Counts:

Count XIX, Malicious Prosecution, and

Count XX, Abuse of Process,

The Obstruction of Court Orders Count:

Count XXI, Violation of 18 U.S.C. § 1509, Obstruction or Interference
With Court Order,

The Counts for Slander, Libel, and Defamation:

Count XXII, Slander and Slander *per se,*

Count XXIII, Libel and Libel *per se,*

Count XXIV, Defamation, and

Count XXV, Intentional Inflection of Emotional Distress,

The Conspiracy and Aiding and Abetting Counts:

Count XXVI, Aiding and Abetting, and

Count XXVIII, Common Law Conspiracy, Agency.

The Income Tax Evasion/Fraud Count:

Count XXIX, Income Tax Evasion, Income Tax Fraud,

The Foreign Corrupt Practices Act Count:

Count XXX, Violation of 15, U.S.C. 78 *et seq.*

The Pierce the Corporate Veil Count:

Count XXXI, Pierce the Corporate Veil

## COUNTS ALLEGED AGAINST T.D.AMERITRADE and BO BELINSKY

*381.* The following Counts are alleged against T.D.Ameritrade and Bo Belinsky, and are incorporated by reference as if fully set forth herein. In each of these Counts, the name T.D.Ameritrade and/or Bo Belinsky, is/are to be substituted for those of Ellipso and/or D.Castiel, C.Castiel, and/or the Castiel Family, or Awkard.

The Racketeering Counts:

Count I, Violation of 18 U.S.C. § 1962(a),

Count II, (Violation of 18 U.S.C. § 1962(b)),

Count III, Violation of 18 U.S.C. § 1962(c), and

Count IV, Violation of 18 U.S.C. § 1962(d),

The Larceny Counts:

Count V, Fraud, and

Count VI, Conversion,

The Negligence Counts:

Count VII, Negligence,

Count VIII, Gross Negligence, and

Count XIX, Detrimental Reliance,

The Equitable Count:

Count X, Unjust Enrichment,

The Statutory Conspiracy Count:

Count XVIII, Violation of 18 U.S.C. § 371, Conspiracy to Commit a
Federal Felony,

The Obstruction of Court Orders Count:

Count XXI, Violation of 18 U.S.C. § 1509, Obstruction or Interference
With Court Order,

The Conspiracy and Aiding and Abetting Counts:

Count XXVI, Aiding and Abetting, and

Count XXVIII, Common Law Conspiracy, Agency

## COUNTS ALLEGED AGAINST BUTZEL, LONG, TIGHE, PATTON, PLLP THOMAS PATTON, KERMIT ROSENBERG, and NEAL GOLDFARB

382. The following Counts are alleged against Butzel, Long, Tighe, Patton, PLLP;

Thomas Patton, Kermit Rosenberg, and Neal Goldfarb, individually and collectively, and

are incorporated by reference as if fully set forth herein.  In each of these Counts, the name(s) Butzel, Long, Tighe, Patton, PLLP; Thomas Patton, Kermit Rosenberg, and Neal Goldfarb is/are to be substituted for those of Ellipso and/or D.Castiel, C.Castiel, and/or the Castiel Family, or Awkard.

The Racketeering Counts:

Count I, Violation of 18 U.S.C. § 1962(a),

Count II, (Violation of 18 U.S.C. § 1962(b)),

Count III, Violation of 18 U.S.C. § 1962(c), and

Count IV, Violation of 18 U.S.C. § 1962(d),

The Larceny Counts:

Count V, Fraud, and

Count VI, Conversion,

The Negligence Counts:

Count VII, Negligence,

Count VIII, Gross Negligence, and

Count XIX, Detrimental Reliance,

The Equitable Count:

Count X, Unjust Enrichment,

The Unfair Trade Counts:

Count XI, Intentional Interference With Contracts,

Count  XII, Restraint of Trade and Unfair Trade Practices,

Count XIII, Conspiracy to Violate D.C. Code §§ 28-4501, *et seq.,*  and

Count XIV, Violation of the Virginia Fair Trade Act,

The Bribery Count:

>Count XV, Bribery and Common Law Bribery

The Perjury Counts:

>Count XVI, Violation of 18 U.S.C. § 1623, Perjury, and

>Count XVII, Violation of 18 U.S.C. § 1622, Suborning Perjury,

The Statutory Conspiracy Count:

>Count XVIII, Violation of 18 U.S.C. § 371, Conspiracy to Commit a Federal Felony,

The "Bad Faith" Litigation Counts:

>Count XIX, Malicious Prosecution, and

>Count XX, Abuse of Process,

The Obstruction of Court Orders Count:

>Count XXI, Violation of 18 U.S.C. § 1509, Obstruction or Interference With Court Order,

The Counts for Slander, Libel, and Defamation:

>Count XXII, Slander and Slander *per se,*

>Count XXIII, Libel and Libel *per se,*

>Count XXIV, Defamation, and

>Count XXV, Intentional Inflection of Emotional Distress,

The *RESPONDENT SUPERIOR* Count:

>Count XXVII, *Respondent Superior,*

The Conspiracy and Aiding and Abetting Counts:

>Count XXVI, Aiding and Abetting, and

>Count XXVIII, Common Law Conspiracy, Agency.

The Income Tax Evasion/Fraud Count:

    Count XXIX, Income Tax Evasion, Income Tax Fraud,

The Foreign Corrupt Practices Act Count:

    Count XXX, Violation of 15, U.S.C. 78 *et seq.*

The Pierce the Corporate Veil Count:

    Count XXXI, Pierce the Corporate Veil.

## DEMAND FOR JURY TRIAL

*383.* Plaintiffs demand trial by jury on all issues.

## REQUESTED RELIEF

**MONETARY DAMAGES:**

*384.* As compensable damages for the injuries suffered, Plaintiffs ask that they be awarded ten million dollars (10,000,000.00);

*385.* Plaintiffs ask that this amount be trebled pursuant to applicable law;

*386.* Plaintiffs ask that they be awarded their costs and attorneys' fees for this action;

*387.* Plaintiffs ask that they be awarded punitive damages of ten million dollars ($10,000,000.00);

*388.* Plaintiffs ask that they be awarded pre and post judgment interest,

**JOINT AND SEVERAL LIABILITY:**

*389.* Plaintiffs ask that each Defendant be held jointly and severally liable for any and all damages awarded;

**INJUNCTIVE RELIEF:**

*390.* Plaintiffs ask that Defendant Ellipso, and its officers, directors, employees, servants, counsels, consultants, or others affiliated with Ellipso, be Restrained from:

*391.* Making any slanderous and or libelous statements concerning Plaintiffs;

*392.* Continuing to pursue any aspect of the "bad faith" litigation against Plaintiff, *Ellipso v. John Mann, U.S.D.D.C., No. 05-0186,* including prosecuting or defending against any appeals in that action;

*393.* Filing any false or fraudulent pleading in the United States Bankruptcy Court for the District of Columbia in, *In re:Ellipso (Debtor), No. 09-0148;*

*394.* Filing any lawsuit, arbitration, claim, or legal action of any sort against Plaintiffs, or any one or combination of Plaintiffs, without the prior order of this Court.

*395.* Plaintiffs ask that Defendant Ellipso be required to disgorge any proceeds from its racketeering activities including, moneys, securities, equipment, supplies, furnishings, electronics patents, real property, intellectual property, intangible property or other things of value, including any procured with the proceeds of the racketeering activities.

**OTHER RELIEF:**

*396.* Plaintiffs ask that this Court grant such other relief as may be just and proper.

Respectfully submitted,

_____
Robert B. Patterson
*Pro se*

_____
Ronald B. Patterson, Esq.
Mann Technologies, LLC
The Registry Solutions Company

_____
John B. Mann
*Pro Se*

**AFFIRMATION**

We solemnly swear or affirm under criminal penalties for the making of a false statement that I have read the foregoing Complaint and that the factual statements made in it are true and correct to the best of my personal knowledge, information and belief.

Date: _____

_____
Robert B. Patterson

_____
John B. Mann